(text box: 1) NO. 5-99-0250

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____________________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Madison County.

)

v. )  No. 89-CF-565

)

PAULA J. SIMS, )  Honorable

)  John L. DeLaurenti,

     Defendant-Appellant. )  Judge, presiding.

_____________________________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

Paula J. Sims gave birth to three children, but she was a mother to only one.  Rather than nurture her two baby girls, she killed them.  A capital murder trial ensued.

A lawyer named Donald Groshong defended Paula's interests before, during, and after her trial.  He represented the interests of her husband, Robert, at the same time.  The authorities suspected that Robert was also involved in the two killings.  Although Robert was never charged, he is still haunted by suspicions that he was somehow involved.

Groshong successfully defended against the State's endeavor to make Paula pay for her misdeeds in kind.  He spoiled the State's effort to set a date with death.  However, the only other aim that he was able to defeat was the prosecution of Robert.  Paula was tried, convicted, and condemned to a life of imprisonment.   

Paula brought these postconviction proceedings alleging the ineffective assistance of counsel.  The trial judge denied postconviction relief, and Paula appeals.   

We are asked to review Groshong's performance, as well as the fidelity with which he performed, in order to decide whether Paula received faithful and competent legal representation.  Paula claims that Groshong dedicated himself to her ex-husband's well-being (Paula and Robert are now divorced), an enterprise that fettered his watch over her own interests.  She also complains that he ignored a viable defense that would have negated criminal responsibility.  Paula wants a new trial that can test whether she suffered from postpartum disorders that substantially diminished her capacity to appreciate the criminality of her conduct.  

We are also called upon to review her sentence in light of the Supreme Court's pronouncement in 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).  

Two daughters were born to the Sims family.  Their births in 1986 and 1989 bracketed the birth of a son in early 1988.  The son thrived, but his two sisters, Loralei and Heather, did not fare so well.  Their stay upon this earth was short-lived.  

Life's journey ended for Loralei a few weeks after her birth in 1986.  The pathologist who performed the autopsy on Loralei believed that someone had placed his or her hands over Loralei's nose and mouth until she suffocated.  After a trial at which she claimed innocence, Paula admitted that Loralei was intentionally deprived of the oxygen needed to sustain life.  However, she contradicted the pathologist's opinion.  She claimed that, rather than place her hands over Loralei's air passages, she simply held Loralei under water until she drowned.  Either way, Loralei drew her last breath under her mother's watchful eye.  Her remains were tossed into a wooded ravine, there to suffer nature's ravages until Jersey County authorities could find her body.    

Heather suffered a similar fate a few weeks after her birth in 1989.

When the Jersey County police answered Paula's feigned cry for help in 1986, Paula cast the blame for Loralei's disappearance on a mysterious masked intruder.  She claimed that he appeared at her home and kidnaped Loralei.  The investigation that ensued produced grave doubts about her story.  The investigators' concerns that Paula was lying lacked sufficient weight to accuse her of any wrongdoing. 

The Sims family moved from Jersey County to Madison County during the ongoing investigation.  Over time, the inquiry into Loralei's death grew cold.  But in 1989, a smoldering investigation reignited, fueled by Paula's report of another abduction by the same mysterious intruder.  Another newborn baby was missing.  Several days after the reported abduction, her remains were found wrapped in a small, plastic trash bag.  The bag was stuffed into a public park trash barrel, presumably for purposes of undetected disposal.

The Madison County authorities spent little time pursuing a phantom killer.  They were unwilling to embrace the unlikely possibility that a bizarre madman with a penchant for killing little babies laid in wait three years, followed the Sims family into Madison County, and singled out another newly arrived Sims family member for his next victim.  Investigators were convinced that they needed to look no further than Heather's parents to discover who was responsible for Heather's death.  Paula and her husband, Robert, were prime suspects from the outset of Heather's murder investigation.  The State removed their son, Randall, from the home.  

Paula and Robert correctly felt an immediate need for legal assistance during the ongoing probe.  Before any charges were leveled, they hired Groshong to represent their respective interests.  He endeavored to assist both of them.  It was an undertaking infused with the potential for developing into a conflict of interest.   

Madison County prosecutors initiated a grand jury investigation into Heather's death.  Don Weber was the assistant State's Attorney in charge of the inquiry.  On June 12, 1989, Weber handed a letter to Groshong.  The letter conveyed the State's interest in taking a statement from Robert.  It suggested that Robert could greatly ease his own concerns by providing information about Paula's guilt.  The letter informed Groshong that the State was "inclined to negotiate" in return for Robert's cooperation and truthful testimony against Paula.  It also intimated that Robert's assistance would be of considerable value to him.  Weber did not specify what Robert would receive in return for his help, but whatever he had in mind was not going to inhibit Robert's future parenting of Randall.  Weber wrote, "[W]e are considering granting custody of the [Sims'] minor [son] to Robert Sims should his statement prove to be true." 

The letter concluded, "Please do not communicate this offer or the contents of this letter to Paula Sims."  After tendering the letter to Groshong, Weber questioned whether Groshong should continue his dual representation.

On June 13, 1989, Groshong wrote a letter to Weber.  Groshong advised that he had discussed the offer with Robert and Paula, in each other's presence, contrary to Weber's wishes.  Groshong requested whatever information Weber possessed that would suggest how Robert might be able to inculpate Paula.  

No negotiation developed between Robert and the State. 

The grand jury indicted Paula on charges of first-degree murder, obstructing justice, and concealing a homicidal death.  The State intended to seek capital punishment.  Robert was not indicted but remained under suspicion.  The State would have welcomed more evidence to confirm its intuitions about his role in the two deaths.

In early 1990, Paula stood trial and testified in her own defense.  She recounted the events surrounding the abductions of Loralei and Heather.  Her tales of woe proved unconvincing.  The jury returned guilty verdicts on all charges.  Shortly thereafter, Paula confirmed the jury's wisdom.  Before the sentencing hearing could begin, she confided in Groshong that her testimony was false.  Paula admitted that she killed her two baby girls.

Her revelation came at an opportune time.  The return of the guilty verdicts enhanced the threat of capital punishment, a circumstance that Weber was determined to turn to new advantage.  Weber's mind turned to another pursuit, stayed but not forgotten.  He wanted to prosecute Robert Sims, based upon a devout belief in Robert's complicity.
(footnote: 1)  He approached Groshong and informed him of his interest in knowing what really happened.  Weber offered to yield further pursuit of capital punishment in return for the truth about the two murders.  Paula's timely confession allowed Groshong to explore the overture.  It is uncertain whether Groshong discussed the overture with both clients, as he had done with the earlier offer to Robert.   

With a death-qualified jury waiting in the wings, it was decided that Paula would talk to Weber in the hopes of avoiding capital punishment.  Paula and Groshong were given an audience with Weber, who gave his personal assurance of confidentiality.
(footnote: 2)  Paula confessed her sins in Weber's presence.  However, Paula's confession did not please him.  It may have eased his mind before he pursued her death, but it failed to meet his expectations.  Paula did not confirm Weber's suspicions about Robert's role in the murders.  She claimed to have acted alone.  Moreover, she claimed that she had drowned her two daughters and that she had deposited Heather in the park trash barrel four days before her body was discovered.  The pathologist was certain that the means of death was suffocation rather than drowning, and the condition of Heather's body when discovered contradicted Paula's claim about the length of stay in the trash barrel.  Weber was certain that Paula was being less than forthright about the two murders.  Hence, he offered no concession and resumed the State's quest to punish Paula with death.    

The jury considered capital punishment.  It found that the crime was death-qualified.  However, Paula dodged the State's poison when the jury deadlocked during the second phase of the sentencing hearing.  Thereafter, the trial judge sentenced Paula to life imprisonment.

Groshong appealed the convictions and sentences to this court, and we affirmed.  
People v. Sims
, 244 Ill. App. 3d 966, 612 N.E.2d 1011 (1993).  He then sought to advance Paula's interests in the supreme court, to no avail.  
People v. Sims
, 152 Ill. 2d 575, 622 N.E.2d 1223 (1993).  Groshong's efforts on Paula's behalf came to an end.   

Paula began to speak about her case with other people.  A prison psychologist, an author, and several other prisoners lent a sympathetic ear.  As a result of the discourse, Paula discovered that mothers who kill offspring often raised insanity defenses.  As she gained knowledge about postpartum disorders, Paula developed the belief that her murderous bent was the by-product of postpartum psychosis.  She also learned that Groshong was aware of comparable cases where postpartum psychosis provided the basis for an insanity defense, but Groshong had not pursued its use. 

Those who suffer from postpartum depression suffer hormonal imbalances that can be discovered through blood tests.  By not testing for it, Groshong bypassed a chance to develop objective evidence of the condition.  

On August 28, 1994, Paula filed a 
pro se
 postconviction petition.  It alleged that Groshong provided ineffective assistance of counsel by dismissing the use of an insanity defense without fully exploring the possibility that she suffered from postpartum depression.  On September 7, 1994, the trial court dismissed her 
pro se
 petition.  She appealed, and we reversed on the grounds that postconviction counsel had failed to comply with Supreme Court Rule 651(c) (134 Ill. 2d R. 651(c)).  
People v. Sims
, No. 5-94-0660 (1997) (unpublished order under Supreme Court Rule 23 (166 Ill. 2d R. 23)).

On remand, counsel's review of the record resulted in the filing of an amended postconviction petition that alleged a host of reasons why Groshong provided ineffective assistance of counsel.  Among them was a claim that Groshong labored under a conflict of interest throughout his dual representation of Paula and Robert.  The trial judge conducted a hearing on the amended petition, at which time he heard the following evidence.

Kathleen Hamill, an assistant appellate defender, testified.  She recounted her efforts to contact Groshong after she read a news account of Heather's death.  Hamill was familiar with similar cases of infanticide where postpartum-depression-based insanity pleas had been employed.  She wanted to share her special knowledge.  She made copies of important documents that explained the defense and that listed expert witnesses to consult.  Hamill testified that she sent this information to Groshong, accompanied with a letter detailing the importance of early medical and psychological diagnostic testing.  According to Hamill, she followed up the correspondence with a phone call to Groshong, in which she reiterated the importance of immediate diagnostic testing in order to detect hormonal imbalances indicative of postpartum illness.      

Edward Loew, a prison psychologist, testified about Paula's therapy during incarceration.  He determined that Paula suffered from major depression following Heather's birth.  Loew discovered feelings of depression and guilt that stemmed from Paula's desire to have a child that her husband did not want and blamed her for having.  According to Loew, during therapy Paula admitted her guilt.  When she did, she insisted that Robert was not her accomplice.

Dr. Diane Sanford, an expert on postpartum disorders, testified at the hearing.  She offered her opinion that Paula suffered from a postpartum-based mental illness at the time that she killed Heather.  

Weber, Groshong, and Paula were also called to testify at the hearing.  

Regarding Groshong's representation, Weber took the position that it worked to Paula's advantage rather than to her detriment.  The June 12, 1989, letter to Groshong was designed to drive a wedge between Robert and Paula, precipitating a betrayal of their common defense.  The divide-and-conquer strategy did not work, due primarily to Groshong's vigil over the Sims' mutual interests.
(footnote: 3) 

Groshong testified about his dual representation in the following manner.  He understood Weber and his methodology.  The letter was clearly an effort to destroy the Sims' united defense.  Both clients were told of the letter's contents and of the potential conflict that the State's invitation created.  Groshong agreed with Weber that Paula was better served by virtue of his dual representation.  He added that Robert and Paula both claimed innocence, a position supportive of one another.  Since their mutual denials of any wrongdoing remained consistent, their interests were never placed at odds.  Their mutual defense remained devoid of antagonism throughout his dual role as their advocate. 

Groshong addressed his decision not to employ an insanity defense as follows.  He studied Hamill's materials and suggestions, had an associate conduct independent research into the use of postpartum-depression insanity defenses, and discussed the possibility of an insanity plea with Paula before electing to discard it.  An insanity plea would have detracted from Paula’s claimed innocence.  Moreover, Paula had never complained of depression-like symptoms, and an examination of her medical records proved consistent with this lack of complaint.  Given the absence of testimony to support a postpartum-depression defense, the better defense was Paula's claimed innocence, a claim made stronger by avoiding inconsistency.  

Groshong added that Paula was persistent in her claim that she had nothing to do with either daughter's death.  She repeatedly insisted that what she had told the authorities was the absolute truth.  Groshong testified that he had fallen prey to Paula's convincing pretense.  He believed her, despite her story's inherent implausibility.   

Paula offered extensive testimony about her postpartum depression.  She explained that because of her affliction, she thought that she was telling the truth when she testified at the trial.  She was absolutely convinced that the two abductions actually occurred.  Paula again admitted that she drowned her babies.  She also reiterated that she acted alone and without Robert's help.  When she was asked about the audience with Weber after the guilty verdicts were returned, the following colloquy occurred: 

"Q.  So, after you told [Weber] what happened, he didn't believe your version of what happened?

 A.  That's right.

 Q.  And[] he made you a deal and wanted you to implicate your husband?

 A.  Yes.

 Q.  And, you didn't do that, refused to do that?

 A.  That wouldn't have been the truth."

Only one major factual dispute developed during the hearing.  Groshong and Paula differed sharply over the extent to which certain matters were discussed during the course of their relationship.  Paula contradicted Groshong's testimony, and she claimed that a potential conflict and the use of an insanity defense were never discussed.  She also quarreled with Groshong's characterization of her persistent claim of innocence.  Paula testified that Groshong asked her to explain what happened on one occasion.  After that, they never spoke of it again.

Robert Sims did not testify at the postconviction hearing.  To date, Robert has escaped prosecution.  

Following the hearing, the trial judge denied postconviction relief, and this appeal ensued.

We confront numerous arguments made in support of one central question–whether Paula was deprived of her constitutional right to the effective assistance of counsel.  The attack on her lawyer has two distinct components.  First, we are called upon to examine the skill and acumen with which Groshong performed.  Paula assails his performance with various charges of how he mishandled the defense.  Second, we are asked to examine the loyalty with which Groshong performed.  Paula contends that his loyalty was hopelessly divided between her and her husband.  She argues that the dual representation prevented him from maintaining exclusive allegiance to her interests and fettered his ability to freely act on her behalf.  Additionally, Paula attacks the constitutionality of her sentence.    

I.  COMPETENCY OF COUNSEL

There are long-standing rules of law that guide an assessment of trial counsel's competence.

Constitutionally competent assistance is measured by a test of whether the defendant received "reasonably effective assistance."  
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984).  We presume that defense attorneys pursue sound trial strategies.  See 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.  Trial strategies are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies.  
People v. Faulkner
, 292 Ill. App. 3d 391, 394, 686 N.E.2d 379, 382 (1997). 

To prevail on an ineffective-assistance-of-counsel claim, "[the] defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  
People v. Lefler
, 294 Ill. App. 3d 305, 311, 689 N.E.2d 1209, 1214 (1998) (citing 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068).  The term "reasonable probability" has been defined to mean "a probability sufficient to undermine confidence in trial's outcome."  
Lefler
, 294 Ill. App. 3d at 311-12, 689 N.E.2d at 1214 (citing 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064).  The fact that professional errors have been committed does not define the question.  We always examine the issue from the perspective of whether the defendant received a fair trial, despite an attorney's shortcomings.  
Lefler
, 294 Ill. App. 3d at 312, 689 N.E.2d at 1214.  In that context, a fair trial means "a trial resulting in a verdict worthy of confidence."  
Lefler
, 294 Ill. App. 3d at 312, 689 N.E.2d at 1214 (citing 
People v. Moore
, 279 Ill. App. 3d 152, 161-62, 663 N.E.2d 490, 498 (1996)).

Because postconviction relief is confined to errors of constitutional magnitude, ineffective-assistance-of-counsel claims routinely find their way into postconviction petitions.  When those claims progress to the stage of a full evidentiary hearing, we defer to the trial judge's decision and will not disturb his judgment unless error is manifest.  
People v. Morgan
, 187 Ill. 2d 500, 540-41, 719 N.E.2d 681, 703-04 (1999).

Failure to Investigate Postpartum Depression Defense

Groshong is taken to task for not adequately exploring the use of a postpartum-depression-based insanity defense.  Paula argues that had he properly investigated the use of postpartum depression to negate her guilt, he would have discovered a more viable defense than the one employed.  She claims, thus, that a reasonable probability exists that the trial's outcome might have been different. 

Groshong was fully aware of the postpartum-based insanity defense and its applicability to cases of infanticide.  Hamill had provided him with a blueprint for its use before charges were even filed.  Despite Hamill's suggestion to conduct immediate diagnostic tests, Groshong made no effort to secure such testing.  Blood tests may have revealed the type of hormonal imbalance indicative of postpartum disorders, evidence in support of the defense.  

Defense counsel have a duty to explore the range of potential defenses that may prove useful to their clients.  
People v. Young
, 220 Ill. App. 3d 98, 581 N.E.2d 371 (1991); 
People v. Baldwin
, 185 Ill. App. 3d 1079, 541 N.E.2d 1315 (1989).  The failure to conduct a proper examination of medical records that would reveal evidence in support of an insanity defense has been held to constitute constitutionally deficient legal assistance.  
Young
, 220 Ill. App. 3d at 108-09, 581 N.E.2d at 379-80.  Whether Groshong fulfilled this duty depends upon whether he did enough to enable himself to make an objectively reasonable decision to forego an insanity defense in favor of Paula's claimed innocence. 

Paula suggests that Groshong was inattentive to the use of an insanity defense.  However, the trial judge heard evidence to refute that suggestion.  Groshong testified that he studied the materials that Hamill sent to him, instructed an associate to thoroughly research postpartum-based insanity defenses, and considered the defense's use on more than one occasion.  According to Groshong, the use of a postpartum-based insanity defense was weighed in a fully informed fashion.  This testimony would clearly distinguish Groshong's conduct from the performances of the lawyers involved in the cases relied upon by Paula.  In 
People v. Young
, defense counsel failed to conduct "even a cursory investigation" of his client's medical records.  
Young
, 220 Ill. App. 3d at 109, 581 N.E.2d at 380.  In 
People v. Baldwin
, counsel defended without a clue that his client had been treated for mental illness over the course of his life.  
Baldwin
, 185 Ill. App. 3d at 1089-90, 541 N.E.2d at 1322.

The evidence adduced at the postconviction hearing established a distinct possibility that Paula suffered from a postpartum disorder when she killed her children.  Thus, it may have proven quite useful to the development of an insanity defense to have conducted the testing that Hamill urged Groshong to arrange.  

Should Groshong have required Paula Sims to undergo blood tests, diagnostic studies, and psychological tests to see if she potentially suffered from postpartum depression?  The answer seems obvious now that we know that Paula killed her two daughters and that she felt depressed on a postpartum basis.  However, these are facts that were unknown in 1990, facts Paula denied under oath at her trial.  Hindsight makes it easy to take issue with Groshong's decision to forego testing and concentrate his efforts elsewhere.  

When the Supreme Court set the standard for reviewing this kind of complaint, it cautioned:  

"Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  [Citation.]  
A fair assessment
 of attorney performance 
requires
 that 
every effort
 be made 
to eliminate the distorting effects of hindsight
, to reconstruct the circumstances of counsel's challenged conduct, 
and to evaluate the conduct from counsel's perspective at the time
."  (Emphasis added.)  
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.    

We examine the question from a 1989 perspective and the state of affairs at that time.  There was nothing to indicate that Paula displayed any of the classic depression or psychotic-type symptoms commonly associated with postpartum defenses.  Her physician's medical records bear no indication of postpartum depression during her medical treatment.  Nor did Paula complain of any such symptoms to Groshong during his representation.  Indeed, she testified at the trial that she did not experience postpartum depression.    

Groshong had to weigh what he had learned from Hamill's packet of materials and his other research on postpartum disorders and apply that knowledge to other circumstances present at the time.  Paula was unable to support the use of the insanity defense.  She insisted that she was innocent.  Groshong claims that he believed her, a claim credited by Paula's own testimony.  Paula testified that she believed in her story about the two abductions.  According to Groshong, Paula asserted this belief in a sincere and convincing manner.  Hence, he decided to concentrate his effort and resources to build a defense around what he and Paula believed to be the truth.

The constitution's call for effective legal representation exacts a great deal from lawyers, but it does not demand the ability to divine the truth.  As we noted in 
People v. Faulkner
:  

"The constitution contemplates assistance that appreciates and understands legal principles applicable to the case.  It contemplates assistance that engages the rules of evidence and procedure designed to assure fairness.  It contemplates assistance prepared to discharge legal duties skillfully and ethically.  The constitution does not, however, contemplate clairvoyance."  
Faulkner
, 292 Ill. App. 3d at 394-95, 686 N.E.2d at 382.

While we acknowledge that professional legal assistance may, from time to time, require research into a potential insanity defense, we are not ready to accept the notion that competent representation requires a defense attorney to maintain a defense theory inconsistent with a client's claimed innocence.  If we take Paula at her word, she was absolutely convinced that she was telling the truth about what had occurred.  Such a circumstance was bound to shape Groshong's thinking.  It is difficult to imagine how any lawyer would present an insanity defense under similar circumstances.  When we consider Groshong's choice from the perspective of what he had to deal with at the time, it does not seem that unreasonable.  Indeed, we wonder what Paula and Robert Sims would have done had Groshong pursued a defense that suggested that Paula was mentally incapable of telling the truth about her two daughters' deaths. 

Groshong's failure to pursue diagnostic testing has to be weighed against his claim that he believed in what his client was saying.  Moreover, it has to be weighed against the dilemma that the use of an insanity defense would have created.  A test of the State's evidence against a plea of not guilty had a better prospect for success without the submission of an insanity defense that Paula could not support with her testimony.  Submitting an insanity defense in tandem with a claim of innocence can be done, but not without obvious risk.  A jury might decide that a defendant failed to meet his burden to prove insanity and, in the process, better understand who committed the murder.  The submission of an insanity plea was certain to adversely impact a claim of innocence.  Telling the jury about postpartum depression and its relationship to infanticide would have suggested that mothers are capable of killing their children after childbirth.  Hence, it would have eliminated some of the trouble jurors might have had in believing that a mother could commit such unthinkable acts.  It would have also suggested that Paula was unworthy of belief.  

We find that the strategy employed was reasonable and sound.  Groshong made a reasoned and calculated choice not to further pursue a defense that his client could not support.  It was not against the manifest weight of the evidence for the trial judge to conclude that Groshong provided reasonably effective assistance when he assessed his options and decided to forego further pursuit of a defense to infanticide based upon postpartum psychosis syndrome. 

[The following text is nonpublishable under Supreme Court Rule 23.]

B.  The Use of Inadmissible Evidence

Next, Paula raises several errors that Groshong failed to challenge at the trial or on appeal.  She argues that Groshong failed to object to or in any manner challenge the State's use of hearsay testimony from Barbara Werner and bloodhound evidence from the Illinois State Police.  She also maintains that during closing argument Groshong permitted Weber to shift the burden of proof.

1.  
Barbara Werner's Testimony

Stephanie Cook, Paula's hospital roommate when Heather was born, testified that Paula told her that a masked gunman knocked her out when she was taking out the trash or burning it and abducted her first daughter, Loralei.  This was not the story she had consistently told the Jersey County authorities.  Paula had always claimed that the masked gunman entered her home, forced her to the floor, and abducted Loralei.  The story recounting Loralei's abduction told to Stephanie Cook six weeks prior to Heather's disappearance mimicked Paula's story to the authorities when Heather disappeared.

Groshong questioned whether Stephanie Cook had simply confused what she subsequently heard about Heather's disappearance with what she was told in the hospital room.  He wanted to diminish the inference that Paula had already concocted a new abduction story just days after Heather's birth.  On redirect, Stephanie Cook testified that she was not confused about what Paula told her, and she offered the existence of corroboration.  She had told her mother, Barbara Werner, what Paula had said and had done so shortly after the statement was made. 

Barbara Werner was called to testify that her daughter conveyed to her, weeks prior to Heather's abduction, a version of Loralei's earlier abduction that coincided with the story Paula told police after Heather's disappearance.

Once defense counsel questioned whether Stephanie Cook had confused what Paula told her in the hospital with what she heard or read about Heather's abduction, Stephanie Cook's account of Paula's statement, conveyed to her mother immediately after the statement was made, became admissible.  See 
People v. Thomas
, 296 Ill. App. 3d 489, 497, 694 N.E.2d 1068, 1074 (1998).  It was a proper use of a prior consistent statement to rehabilitate the witness's testimony after a suggestion that the statement was never made and that the witness was recounting information she only recently learned from  reported accounts of Heather's disappearance.  Groshong cannot be taken to task for failing to complain about the introduction of admissible evidence. 

2.  
Shifting the Burden of Proof During Closing Argument

Paula complains that Groshong failed to object to a series of questions posed by Weber during closing argument.  Weber told the jury, "[T]here are a number of things that the defense really should explain to you in their closing argument."  He then asked the jury to consider numerous inconsistencies in the abduction story conveyed through the testimony of Paula.  Paula maintains that the argument shifted the burden of proof. 

Again, we can find nothing improper in the argument as framed.  Groshong cannot be faulted for failing to challenge valid and appropriate comment on evidence during closing argument.  Paula testified.  Once she did so, the prosecutor could question that testimony in the manner employed and challenge defense counsel to respond to the inherent inconsistencies found in that testimony.  When a defendant testifies as to what happened, she must tell a reasonable story or be judged by its improbabilities.  
People v. Sykes
, 45 Ill. App. 3d 674, 680, 359 N.E.2d 897, 901 (1977). 

Weber's argument was designed to expose the reasons why Paula's testimony was unworthy of belief.  Her story of innocence was evidence properly subject to such attack.  The argument was fair comment, and the approach employed would be appropriate any time a defendant tenders testimony riddled with flaws.  To the extent that the jury might infer that a defendant failed to establish her innocence, such an unspoken message is cured by the standard instructions on the presumption of innocence and the burden of proof.  The jury was so instructed in this case.   

3.  
Bloodhound Evidence

Four Illinois State troopers were called to testify about the training and skills of the police dog.  After qualifying the expertise that a police dog possesses, the troopers testified about their efforts to employ that expertise in 1986, when Paula reported Loralei missing.  Various dogs were used to track the path Paula claimed that the masked gunman took after taking her child.  Because their dogs could not pick up a scent to track, the troopers concluded that the information provided by Paula was a lie.  Trooper Michael Donovan further testified that he and his dog failed to detect a scent to track in 1989 when Paula claimed the gunman revisited her and abducted a second infant.  

This evidence was clearly inadmissible.  
People v. Pfanschmidt
, 262 Ill. 411, 461, 104 N.E. 804, 823-24 (1914); 
People v. Cruz
, 162 Ill. 2d 314, 369-70, 643 N.E.2d 636, 662 (1994); 
Lefler
, 294 Ill. App. 3d at 308, 689 N.E.2d at 1212.  Groshong was apparently unaware of that fact, for he did not object to its admission or the various closing arguments Weber made about it. 

The State poses a feeble argument that this evidence was merely presented to show how the authorities followed every lead to recover the babies.  That was not its purpose.  It was admitted to discredit Paula's story by establishing the power of a dog to track a scent and the inability of numerous trained police dogs to do so.   The argument was simple–if a masked gunman took these babies as Paula claimed, dogs would have been able to track his path from the house.  Since they could not do so, he never existed and Paula made him up.

This was damaging evidence.  We can think of no strategic reason why defense counsel would allow it to be admitted.  Even if there was one, we could not find it to be sound.  

We turn to the prejudice prong of the ineffective-assistance-of-counsel claim to determine whether there is a reasonable probability of a different result but for counsel's error.  We do not believe so.  We are confident that a different outcome was not a possibility, even if the State had been checked in its effort to introduce bloodhound evidence. 

Paula fabricated a story that would have taken a gigantic leap of faith to believe.  The jury would not likely have accepted it even in the absence of dog-tracking evidence to discredit it.  The State produced ample evidence that her story was concocted.  Three witnesses contradicted Paula's claim that she was rendered unconscious from a blow to the head.  Once any facet of her story fell, its overall inherent implausibility was certain to doom its acceptance.  And once the jury disbelieved Paula's story, other evidence established that only she and Robert could have had the opportunity to murder Heather.  The outcome was quite apparent.

For the reasons stated, we do not find it against the manifest weight of the evidence to conclude that counsel's failure to object did not render the assistance of counsel constitutionally infirm.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

II.  CONFLICT OF INTEREST IN REPRESENTING BOTH PAULA AND ROBERT

The right to the effective assistance of counsel under the sixth amendment to the United States Constitution entitles a criminal defendant to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations.  
People v. Coleman
, 301 Ill. App. 3d 290, 298-99, 703 N.E.2d 137, 143 (1998) (citing 
Glasser v. United States
, 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 (1942)).

Groshong represented the interests of two prime suspects in the Heather Sims murder investigation.  During his watch, one of those suspects was formally charged with Heather's murder, while the other was not.  One client now finds herself imprisoned for life, while the other client enjoys his freedom.  If outcome was the measure of a lawyer's allegiance, we might easily conclude that Groshong divided his duty of loyalty to Paula in a manner that favored Robert.  However, outcome does not define the question.  The stark contrast in what happened to Groshong's two clients merely provides the uneasy context within which several conflict-of-interest arguments are advanced. 

Paula first argues that Groshong's aim of shielding Robert from criminal charges prevented him from providing proper counsel to her.  Paula claims that Groshong should have tried to persuade her to implicate Robert.  Had he done so, she may have obtained a lesser sentence.

This position is untenable.  Although Paula has changed her story over the years, she has remained constant about Robert's lack of complicity in the two murders.  Her consistency draws credit from the markedly different circumstances under which she has been questioned.  At one point, the act of implicating Robert had the power to spare her from execution.  Later, she confided in a trusted psychologist that Robert was not involved.  And finally, when implicating Robert would have bolstered her claim against Groshong, she testified under oath that she acted alone.

Paula insists that Robert is innocent and that any claim otherwise would have required dishonesty.  Therefore, we confront two possibilities, neither of which can legitimately support her argument. 

Our first option requires the rejection of Paula's testimony.  We would have to find that Paula has been consistently dishonest about Robert's lack of complicity.  Thereafter, we would have to presume that Groshong possessed a power of persuasion that a threatened execution lacked.  We are unwilling to do either.

Our other option is to accept Paula's claim that Robert was guilt-free.  When we accept her testimony that any accusation of complicity would have been untruthful, we are confronted with a unique argument.  Paula promotes the position that she was entitled to legal guidance that urged her to lie.  

Groshong was obliged to conform his advocacy to the requirements of the law.  Attorneys must scrupulously avoid the promotion of perjury, despite a temptation that flows from knowing what a prosecutor wants to hear in return for favorable treatment.  An attorney's fidelity to the law overrides whatever interest a client may have in procuring favor from the State with false accusation.     

In light of Groshong's ongoing representation of Robert, we would like to think that before he had her meet with Weber, he made himself aware of Paula's inability to implicate Robert.  However, even if he expected Paula to accuse Robert of wrongdoing, his stewardship over Robert's interests is not at issue.  The question is whether the loyalty owed to Robert fettered Groshong's ability to assist Paula.  Since he could not advise Paula to implicate Robert without counseling her to lie, Robert's interests in no way hindered his ethical obligations to Paula.  Groshong's obligation to Robert certainly harbored the potential for conflict, but that potential could not mature into an actual conflict unless Paula possessed the ability to bring Robert's interests into play.  She needed to possess knowledge of Robert's guilt and a willingness to honestly expose it.  By her own account, the implication of Robert was a capability that she did not possess.  

Next, Paula argues that Groshong should have introduced certain evidence about Robert in order to mitigate Paula's sentence.  She attributes the failure to bring forth such evidence to Groshong's aim of protecting Robert from harm.  The argument asks us to decipher how the evidence would have been admissible, why it would have benefited Paula, and the manner in which it would have damaged Robert. 

We are simply told, "[W]hile Groshong was aware that Robert had placed unusually restrictive rules on Ms. Sims and his children[] and that he had created other uncommon marital pressures, he did not question Robert about these at trial, nor did he present evidence of Robert's idiosyncracies in mitigation at sentencing."  From this, Paula concludes that Groshong's loyalty to Robert prevented the use of this evidence to persuade the sentencing judge to be more lenient.   

Since Paula does not say what purpose the evidence would have served, we assume that its use would have been to mitigate guilt by establishing the unique marital pressures that contributed to it.  However, Paula and Groshong had procured Weber's silence about Paula's admitted guilt, a step consistent with a strategy to maintain innocence throughout sentencing and appellate review.  Paula masked her guilt at sentencing and pretended to be innocent.  The suggestion that Robert's idiosyncratic behavior somehow drove Paula to infanticide would have contradicted her simulated innocence, a step taken in part to allow an uncertainty of guilt to compromise the severity of the sentence. 

Under such circumstances, we attribute a restraint in the presentation of evidence in mitigation of guilt to strategy rather than a desire to somehow protect Robert.  Reviewing courts are not at liberty to create a conflict of interest by thinking up other strategies that might have been pursued.  
People v. Mahaffey
, 165 Ill. 2d 445, 457, 651 N.E.2d 174, 181 (1995).  We will not undo a conviction based upon a hypothetical conflict.  
Mahaffey
, 165 Ill. 2d at 457, 651 N.E.2d at 181. 

[The following text is nonpublishable under Supreme Court Rule 23.]

Next, Paula argues that Groshong's representation of Robert hampered his ability to counter one of Weber's closing arguments.  Robert testified on Paula's behalf.  Weber told the jury to disbelieve his testimony because he, too, was guilty of the two murders.  Paula does not say how Groshong's representation of Robert hindered his response.  We wonder how a different lawyer, unobligated to Robert, could have better countered the argument.

The State's argument harbored a weakness that Groshong exploited.  If the evidence established Robert's guilt, he should have been charged.  The State's failure to bring charges against Robert on comparable circumstantial proof demonstrated the weakness of the State's case against Paula.  Groshong argued that the State produced no more evidence on its informal accusation of Robert than it had on its indictment of Paula.  There is nothing from which to conclude that Groshong was restrained by the need to somehow protect Robert.  His argument was strategically sound.  See 
Mahaffey
, 165 Ill. 2d at 457, 651 N.E.2d at 181.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

Groshong's representation of Paula and Robert throughout these proceedings possessed the potential for developing into a conflict of interest.  We could think of a number of ways that different trial strategy may have ripened this potential, but the arguments presented fail to show how the respective interests of husband and wife were ever placed at odds.  We find that the ever-present potential for conflict never matured into an actual conflict of interest. 

III.  CONFLICT 
PER SE

Finally, we examine Groshong's dual representation in light of our recent decision in 
People v. Woidtke
, 313 Ill. App. 3d 399, 729 N.E.2d 506 (2000).  Under similar circumstances, we held that a conflict 
per se
 arose from the contemporaneous representation of a defendant and of an earlier suspect in the investigation that led to that defendant's arrest.  
Woidtke
, 313 Ill. App. 3d at 412, 729 N.E.2d at 515-16.  Paula points to the reasoning that guided that decision and maintains that her representation was presumptively unsound.  Following the same analysis that led to our decision in 
People v. Woidtke
, her argument is essentially as follows.  

By assuming the contemporaneous representation of Robert, Groshong tied his obligations to someone who would reap a benefit from her conviction.  Since Robert was a suspect in the investigation that led to her arrest, he stood to gain from a verdict adverse to her.  Even though authorities were free to further pursue Robert after her trial, as a practical matter, her conviction and sentencing would likely dissipate any further pursuit.

We revisit what constitutes a conflict 
per se
.  

There are certain contemporaneous representations that we have decided not to tolerate, even in the absence of a showing that anyone was prejudiced by the existing conflict.  Where the competing interests of two clients are directly at odds, we presume ineffectiveness without an inquiry into how a lawyer actually performed.   

Thus, the contemporaneous representation of both a burglary victim and the person accused of committing that burglary presents an inherent conflict that renders the representation ineffective 
per se
.  
People v. Stoval
, 40 Ill. 2d 109, 111-14, 239 N.E.2d 441, 443-44 (1968).  A lawyer cannot act as the administrator of a murder victim's estate while representing the accused murderer without laboring under an integral conflict that presumes ineffectiveness.  
People v. Coslet
, 67 Ill. 2d 127, 131-36, 364 N.E.2d 67, 69-71 (1977).  And defending someone against a murder charge while representing three key prosecution witnesses constitutes presumptively deficient legal assistance.  
People v. Coleman
, 301 Ill. App. 3d 290, 298-302, 703 N.E.2d 137, 143-45 (1998).

The supreme court has provided guidance for detecting a conflict 
per se
.  A conflict 
per se
 arises where "defense counsel *** ha[s] a tie to a person *** [who] would benefit from an unfavorable verdict for the defendant."  
People v. Spreitzer
, 123 Ill. 2d 1, 16, 525 N.E.2d 30, 35 (1988).  In such a case, the defendant is not required to show prejudice as a result of the representation; the representation is deemed ineffective as a result of the inherent conflict.  
Spreitzer
, 123 Ill. 2d at 14-16, 525 N.E.2d at 34-35.

This presumption of ineffectiveness is not without its source.  It arises inextricably from the conspicuous nature of the competing interests involved, interests so directly at odds that an impending conflict is apparent.  Because the approaching conflict is obvious, we assume counsel's awareness of the consequence of continued representation.  Counsel faces a no-win scenario that cannot be avoided–another client will either enjoy a benefit from an unsuccessful defense effort or suffer some harm from an acquittal.  We are unwilling to review how counsel deals with this predicament.  The supreme court has set forth the reason, stating that counsel's 
knowledge
 that a 
favorable outcome 
for a defendant would 
inevitably conflict
 with the interests of another client might "subliminally" affect counsel's performance in ways difficult to detect or demonstrate.  
Spreitzer
, 123 Ill. 2d at 16, 525 N.E.2d at 35.

The contemporaneous representation of a defendant and of another suspect in the same investigation that led to that defendant's arrest does not present a blatantly obvious conflict.  It is not a representation of directly opposed interests that must inevitably collide–that is, the kind of competing interests that give rise to a conflict 
per se
.  While a potential for conflict certainly exists, the interests of a defendant and of another suspect can often remain entirely compatible.  As long as those interests remain constant, counsel can represent both a charged defendant and another individual who fell under suspicion for the same crime.  Should those interests ever diverge, counsel would be obliged to withdraw from the representation.
(footnote: 4)  There is no reason to presume from the very nature of the interests represented that counsel's allegiance to one or the other client will suffer "subliminal" impairment.  In those cases where counsel's continued contemporaneous representation is challenged, we can easily detect whether the potential for conflict ever materialized into an actual conflict that prejudiced someone's interests.  

Our earlier decision rested upon the benefit that a suspect derives from the conviction of someone else–a diminished pursuit from the authorities.  However, such a benefit is minimal, if not illusory.  It is the formal accusation of someone else, rather than a conviction, that shields other suspects from further pursuit.

In 
People v. Woidtke
, the State argued that counsel's other client would not necessarily benefit from Woidtke's conviction.  It reasoned that a conviction would not foreclose further prosecution if additional evidence of the other suspect's involvement was ever discovered.  We dismissed this argument based upon our practical knowledge of what happens after authorities successfully prosecute someone.  We noted, "As a practical matter, however, it is unlikely that such evidence would be actively pursued after defendant's conviction and sentencing."  
Woidtke
, 313 Ill. App. 3d at 411, 729 N.E.2d at 515.

While this view is undoubtedly true, there is another practical reality that was not factored into the assessment of the interests' competing nature.  It is equally important to assess what would happen if the defendant were acquitted.  Counsel's awareness that harm would inevitably befall another client as a result of an acquittal is essential to the presumption of ineffectiveness.

Once law enforcement authorities dismiss other suspects in favor of the person they believe committed the crime, and once enough evidence is gathered to level formal charges against that person, they rarely reopen their investigation after an acquittal.  Authorities tend to maintain their belief in the charged defendant's guilt, despite a determination that their evidence failed to remove a reasonable doubt.  Thus, the benefit that other suspects reap from someone else's conviction extends little, if any, gain in the protection already derived from the formal charging process.   The presumption of ineffectiveness demands a starker conflict, one capable of subconsciously impairing counsel's zeal in obtaining a favorable result for another client.  The delusory gain that awaits a passed-over suspect when someone else is convicted is not likely to impair an attorney's fervor in the defense of the criminally accused.  As a practical matter, competent defense counsel would not entertain thoughts that the successful defense of an accused client would unleash detectives on a renewed hunt, scouring discarded suspect lists for the real offender.  Experience would lead counsel to believe that authorities would remain convinced that they had solved the crime.  Rather than further pursue the case, authorities would dispute the conclusion that the evidence leading to the arrest did not measure up to the necessary standard of proof.  An acquittal routinely ends the inquiry, an outcome entirely consistent with the interests of other suspects.      

We conclude that Groshong's contemporaneous representation did not constitute a conflict 
per se
.  Groshong's dual representation, like all joint and multiple representations, harbored a constant potential for conflict.  However, the competing nature of his two clients' interests was not conspicuous.  Nor was it inevitable that such interests would actually conflict.  As previously noted, an actual conflict never materialized. 

The supreme court provides support for this view.  An attorney can ethically represent more than one defendant accused of committing the same crime, provided the interests of two or more defendants do not diverge.  In 
People v. Mahaffey
, the representation of more than one defendant was drawn into question under the principles set forth in 
People v. Spreitzer
.  
Mahaffey
, 165 Ill. 2d at 456, 651 N.E.2d at 181.  The supreme court held that the contemporaneous representation of two people charged with the same crime does not constitute a conflict 
per se
.  It explained:

"[T]he joint representation of criminal defendants by a single attorney does not, by itself, violate [the right to effective assistance of counsel] ***.  ***  [T]o prevail on a claim of ineffective assistance of counsel based on joint representation of criminal codefendants by a single attorney, where the trial court was not apprised of a potential conflict, a defendant must show an 
actual
 conflict of interest manifested at trial."  (Emphasis in original.)  
Mahaffey
, 165 Ill. 2d at 456, 651 N.E.2d at 181.

It is beyond question that the contemporaneous representation would not have constituted a conflict 
per se
 had the State charged Robert.  Under such a circumstance, we would judge the validity of the representation based upon whether Paula could establish that an actual conflict manifested itself during the trial.  We think it incongruous to allow a client's uncharged status to redefine the kind of competing interest that renders contemporaneous representation presumptively infirm.

When Robert and Paula engaged Groshong's assistance, they were both suspects in the Heather Sims murder investigation.  The loss of two infant daughters to murder shortly after their births was a detail that spoke of parental guilt and applied with equal force to both of them.  After Paula was formally charged, Robert's status did not change.  He remained a prime suspect, still targeted for potential prosecution.  Groshong realized throughout his dual representation of Paula and Robert that Robert remained a target.     

There was no conflict when Groshong assumed the dual representation.  Since Robert and Paula claimed innocence, their interests were perfectly compatible.  There was nothing to indicate that their mutual interests would inevitably conflict.  This perspective did not change when Paula was charged.  The interests of Robert and Paula stayed harmonious and never diverged over the course of the proceedings.  

There was no reason for Groshong to anticipate that Robert would derive a benefit from Paula's conviction.  While an acquittal would have brought an obvious benefit, there was no way of knowing what effect an adverse verdict would have.  Indeed, this case teaches that an attorney can remain loyal to the interests of the accused and, at the same time, serve the interests of another suspect.  Robert remained a viable target even after Paula was charged because authorities believed that he participated in the murders.  Thus, the return of guilty verdicts against Paula did not dispel the pursuit of Robert.  Rather than dull Weber's aspirations, the guilty verdicts rekindled his desire.  Here, counsel's efforts to obtain an acquittal were entirely consistent with another suspect's interests.  

Since there was no conflict 
per se
 as a result of the contemporaneous representation, and since Paula failed to demonstrate how an actual conflict manifested itself at the trial, we hold that the representation received was constitutionally sound. 

For the various reasons stated, there is no basis to overturn the trial judge's ruling that Paula received the effective assistance of counsel. 

IV.  THE CONSTITUTIONALITY OF SENTENCE

Finally, we decide whether the sentence imposed in this case comports with due process and the right to a trial by jury.  We hold that it does.

The right to a trial by jury entitles an accused to a jury determination of those facts that set the maximum sentence the law will allow for the offense committed.  
People v. Nitz
, 319 Ill. App. 3d 949, 969, 747 N.E.2d 38, 54  (2001).  Here, the defendant received all that this right guarantees.  At the death-qualifying phase of the sentencing hearing, the State presented evidence to establish the existence of an aggravating factor necessary to impose death as punishment.  Thereafter, the jury retired to deliberate with this instruction:

"Before the defendant may be found eligible for a death sentence under the law, the State must prove the following propositions:

First: That the defendant was 18 years old or older at the time of the commission of the murder *** [and]

Second: That the following statutory aggravating factor exists:

The murdered person was under 12 years of age and the death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty." 

The jury was further told that these two propositions had to be proven beyond a reasonable doubt.  The jury returned a finding that Paula was death-eligible.  Hence, it determined that the proof established beyond a reasonable doubt that the murder victim was of tender age and that the murder was set apart from other murders by its exceptionally brutal nature.  See Ill. Rev. Stat. 1989, ch. 38, par. 9-1(b)(7) (now 720 ILCS 5/9-1(b)(7) (West 1998)).

The trial judge made no factual finding necessary to enhance his sentencing power.  See 
Apprendi
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348.  When the jury made its death-eligible findings, it expanded the trial judge's sentencing range to include life's duration as punishment.  The jury determined beyond a reasonable doubt those facts that determined the maximum sentence under the law.  Thus, the sentence of life imprisonment is constitutionally sound.  See 
People v. Williams
, 317 Ill. App. 3d 945, 742 N.E.2d 774 (2000).

V.  CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

Affirmed.

HOPKINS and MAAG, JJ., concur.

                                      NO. 5-99-0250

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Madison County.

)

v. )  No. 89-CF-565

)

PAULA J. SIMS, )  Honorable

)  John L. DeLaurenti,

     Defendant-Appellant. )  Judge, presiding.

___________________________________________________________________________________

Opinion Filed
: June 11, 2001

___________________________________________________________________________________________________________

Justices
: Honorable Clyde L. Kuehn, J.

Honorable Terrence J. Hopkins, J., and

Honorable Gordon E. Maag, J.,

Concur

___________________________________________________________________________________________________________

Attorneys
 Daniel M. Kirwan, Deputy Defender, Michelle A. Zalisko, Assistant Defender, Office of the State Appellate

for
 Defender, Fifth Judicial District, Route 15 East, P.O. Box 2430, Mt. Vernon, IL 62864-0047

Appellant
 

___________________________________________________________________________________________________________

Attorneys
 Hon. William Haine, State's Attorney, Madison County, 157 North Main, Edwardsville, IL 62025; Norbert

for
 J. Goetten, Director, Stephen E. Norris, Deputy Director, Gerry R. Arnold, Staff Attorney, Office of the State's

Appellee
 Attorneys Appellate Prosecutor, Route 15 East, P.O. Box 2249, Mt. Vernon, IL 62864

___________________________________________________________________________________________________________

FOOTNOTES
1:
Weber testified at the postconviction hearing that he still believed in Robert's guilt.  There is no reason to 

think that he has shaken the feeling to this day.

2:
The confidential nature of the meeting created a unique circumstance after the meeting failed to produce a deal.  Weber honored his word and kept the secret of Paula's confessed guilt, despite a pending murder charge in Jersey County and the ongoing nature of these proceedings.

3:
This position assumes that an attorney disinterested in Paula's well-being would have behaved differently when tendered the letter.  It implies that an attorney representing only Robert's interests would have pressed harder for Robert to side with the prosecution and testify against Paula.  If Robert had been more apt to protect his own interests at Paula's expense under the guidance of a different attorney, the dual representation obviously served Paula well.

4:
The potential for conflict can easily ripen into an actual conflict.  If the evidence in support of the other suspect's guilt is of sufficient weight to admit into evidence and the suspect's guilt would tend to negate the defendant's guilt, the conflict is real and counsel must not proceed to trial.  Paula makes no argument that the evidence of Robert's guilt was capable of negating her own.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 06/11/01.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.