THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES V. FAULKNER, Defendant-Appellant.

Fifth District    No. 5—95—0241

Opinion filed October 14, 1997.

Daniel M. Kirwan, of State Appellate Defender's Office, of Mt. Vernon, and Donna Hickstein-Foley, of State Appellate Defender's Office, of Chicago, for appellant.

Charles Garnati, State's Attorney, of Marion (Norbert J. Goetten, Stephen E. Norris, and Kevin Sweeney, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE KUEHN delivered the opinion of the court:

This case features the disappearance of a man named William Rose. Rose vanished mysteriously in June of 1984. He has never been seen since, and his whereabouts remain unknown. It is quite reasonable to suspect that he will never be heard from again.

In 1987, the mystery surrounding Rose's disappearance unraveled into a bizarre tale of murder spun by defendant's offspring, Jimmy and Valerie Faulkner. Jimmy Faulkner offered an eyewitness account of Rose's unnatural demise. It is an eerie account of Rose's death and disappearance that the entire Faulkner family now disavows. When offered at defendant's trial, it found support in other evidence presented and rang true to the Williamson County jury that heard it.

Jimmy's testimony told of a dreadful night sometime in June of 1984. On that night, Jimmy's father insisted that Jimmy accompany him to his parents' bedroom. There he saw his naked mother on top of Rose, engaged in adulterous sexual intercourse. His mother did not appear surprised at his father's presence. She did pause, however, to ask why Jimmy was there. Apparently, Jimmy was brought to the bedroom by his father to witness a killing. Jimmy watched as his father plunged a knife blade deep into Rose's chest. As Rose's heart pumped, blood gushed from the wound. Rose was taken to the bathroom, placed into the bathtub, and watched until his life drained away.

When the bedlam created by defendant's shocking deed subsided, defendant's wife, Judith, and his two children, Jimmy and Valerie, helped dispose of the corpse. Rose was wrapped in a drop cloth and stuffed into the family car's trunk. His remains were taken to a remote and abandoned strip mine pit, where they were left to suffer nature's ravages. The Faulkner family suffered silence and shared a dark secret for several years.

Defendant currently serves a life sentence without parole. We affirmed his murder conviction in *People v. Faulkner*, 186 Ill. App. 3d 1013, 542 N.E.2d 1190 (1989). We are asked now to overturn a denial of postconviction relief.

■ This appeal raises but one question. Does defendant deserve a new trial because of trial counsel's failure to properly impeach Jimmy Faulkner? To prevail, defendant must show that counsel's neglect in attacking Jimmy's credibility was so deficient that counsel failed to function as the "counsel" guaranteed defendant under the sixth amendment. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Defendant must show a degree of error

that, in effect, vitiates counsel's contemplated constitutional role. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Defendant's claim mounts two bases for impeachment never pursued by defense counsel at defendant's trial. Both clearly bear on the worth of Jimmy Faulkner's trial testimony.

Defendant inveighs the failure to expose the true motivation behind his son's resolve to bear false witness against him. That motivation is set forth in a 1991 affidavit in which Jimmy repudiates his trial testimony. Jimmy belatedly swears that Rose's murder is a complete and outright canard. He swears that his testimony was no more than the false product of self-interest motivated by threats from authorities.

Shortly before the 1987 trial, Jimmy recanted his initial murder account. In a written statement to defense counsel, he insisted that his earlier statements to authorities were totally false. In his 1991 affidavit, Jimmy discloses that the written recantation was met by an unannounced and secret visit from authorities. Jimmy claims that the Williamson County State's Attorney and the case agent in charge of the investigation met with him in response to notice of Jimmy's recantation. Jimmy swears that authorities assured him that he and his other family members would be jailed unless he persisted in his fabricated eyewitness murder account. Thus, the trial testimony belies the truth. Jimmy testified to a pack of lies in order to protect himself and his family. Defense counsel did not expose Jimmy's deceit.

Defendant also denounces the failure to adduce testimony from Helga Davis, a Faulkner family friend. Counsel was clearly aware of Davis and her bearing on Jimmy's testimony. Unquestionably, Davis possessed knowledge of prior statements to discredit that testimony. Jimmy confided to Helga Davis, prior to trial, that his initial disclosures about William Rose's untimely death were lies. He confessed to her that the testimony relied upon by the prosecution was a fabricated yarn.

At first blush, the ineffective assistance of counsel claim raises obvious shortcomings in trial counsel's efforts to discredit a key prosecution witness. Upon closer examination, however, defendant's claim exhibits the worst of hindsight's ills. It offers an inconsiderate critique of trial counsel's work from a perspective that did not exist when the work was performed. Those in search of a constitutional peg for post-conviction relief often neglect warnings set forth long ago that constrain sixth amendment claims. The Supreme Court cautioned over a decade ago:

"Judicial scrutiny of counsel's performance must be highly

deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] *A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.*" (Emphasis added.) *Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct at 2065.

Criminal defense lawyers are understandably constant prey for disgruntled defendants who equate their trial's adverse outcome with "ineffectiveness." Counsel's assistance at trial does not, however, have to produce successful results to pass constitutional muster. Thankfully, highly competent defense attorneys applying masterful skills to righteous prosecutions of guilty defendants rarely prevail.

■ It is presumed that defense counsel pursue "sound trial strategies." *Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. The need to engage this presumption arises only after convictions. Therefore, in all ineffective assistance of counsel claims, the defense strategies presumed sound did not work. The strategies must be shown to be more than unsuccessful to overcome a presumption of soundness. They must appear irrational and unreasonable in light of the circumstances that defense counsel confronted at the time. See *People v. Moore,* 279 Ill. App. 3d 152, 663 N.E.2d 490 (1996). Trial strategies are unsound only when no reasonably effective criminal defense attorney, facing similar circumstances, would pursue such strategies. The constitutional measure for legal representation is "reasonably effective assistance." *Strickland,* 466 U.S. at 687-88, 80 L. Ed. 2d at 693-94, 104 S. Ct. at 2064-65.

To be sure, criminal defense lawyers shoulder a serious responsibility. They cannot assume representation of the criminally accused lightly. They must perform in a reasonably effective manner to assure the reliability of the trial process. Absent an objectively reasonable performance from trial counsel, the process to outcome may not instill the confidence that courts seek. See *Moore,* 279 Ill. App. 3d 152, 663 N.E.2d 490.

Criminal defense lawyers are expected to provide the degree of assistance the constitution contemplates. The constitution contemplates assistance that appreciates and understands legal principles applicable to the case. It contemplates assistance that engages the rules of evidence and procedure designed to assure fairness. It contemplates assistance prepared to discharge legal duties skillfully

and ethically. The constitution does not, however, contemplate clairvoyance.

■ The 1991 affidavit unquestionably bears witness to Jimmy Faulkner's lack of credibility. It evinces proof that Jimmy lacks any allegiance to an oath. Nevertheless, the affidavit does not establish that Jimmy would have enlightened anyone with his 1991 version of truth, had he been asked to share it in 1987. Nor does the affidavit tell us how counsel could divine this version of truth in the face of Jimmy's determined effort to conceal it. In 1987, Jimmy sang a tune of cold-blooded murder against his father. While that tune may have been orchestrated by the State, it was in harmony with other evidence of defendant's guilt. In fact, Jimmy's 1987 resolve bypassed a chance to disclose the coerced nature of his testimony. When asked whether his testimony was motivated by anything told him by the Williamson County State's Attorney, he swore that the State's Attorney only told him to speak the truth.

Whether Jimmy committed perjury at trial or in his affidavit is not at issue. Whether he would have yielded his deceit at trial if asked is also not at issue. Our inquiry deals solely with counsel's performance given the circumstances confronted at the time Jimmy testified.

At trial, counsel heard a markedly different version of truth than the one tendered in the 1991 affidavit. Jimmy swore that he saw his father commit murder. His testimony trumpeted caution and counsel heeded the warning. Counsel skillfully avoided inquiry absent a certainty of Jimmy's response. Counsel's avoidance of the unknown was particularly astute given his possession of Jimmy's written statement. The statement contradicted everything Jimmy testified to and provided undeniable proof that Jimmy was a self-confessed liar.

Defense counsel's strategy appears decidedly sensible under the circumstances confronted. Assuming the 1991 affidavit's truth, we cannot envision a strategy the deployment of which would have evoked that truth. With apologies to Erle Stanley Gardner, in the real world, strongly motivated and determined liars do not betray their cloaked motives and confess their prevarications under skillful cross-examination.

Defense counsel managed to expose Jimmy's word to the years of silence before his accusation surfaced, to the belated accusation's recantation, and to admitted ulterior motives to lie. In addition, defense counsel confronted Jimmy with his pretrial admission to Helga Davis. Jimmy conceded that he told Davis that the Rose murder was a total fabrication. Under the circumstances of Jimmy's concession, defense counsel's strategy to forego Davis's testimony was

sensible. The defense obtained a concession to the prior inconsistent statement. The concession removed any need to call Davis to establish that the statement was made. The removal of such necessity also removed the prosecution's ability to highlight the fond relationship between Helga Davis and Judith Faulkner, Jimmy's mother. In fact, calling Davis would not have impeached Jimmy. Rather, it would have diminished the earlier admission's impact.

Clearly, defense counsel's performance was well within constitutional standards. Defendant's imprisonment is not the result of any demonstrable shortcomings on trial counsel's part.

For the foregoing reasons, we affirm the trial court's denial of postconviction relief.

Affirmed.

MAAG and GOLDENHERSH, JJ., concur.