THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERAMEY R. BROWN, Defendant-Appellant.

Fifth District   No. 5—03—0489

Opinion filed May 27, 2005.—Rehearing denied June 24, 2005.

WELCH, J., dissenting.

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

William A. Mudge, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Trent M. Marshall, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

A Madison County jury found Jeramey R. Brown (the defendant) guilty of first-degree murder, for his role in the stabbing death of a young man named Michael Keller (Michael Keller or Keller). The same jury reached a decision that the slaying had been accompanied by brutal and heinous behavior, indicative of wanton cruelty. Judge James Hackett employed the jury's added finding, coupled with a prior conviction for residential burglary, to impose a prison term 15 years

longer than the maximum punishment for first-degree murder alone. Thus, the defendant currently serves an extended-term 75-year prison sentence, his punishment for having previously offended and for having committed a murder accompanied by the kind of brutal conduct that suggests wanton cruelty.

Michael Keller worked as a cook for the Granite City Ponderosa Steakhouse. He garnered a modest, hard-earned living, filling orders at the grill. His employment led to the ownership of a humble Granite City home, an Oldsmobile for his transportation, and a few modern-day creature comforts like a large-screen television set and a stereo system.

April 16, 2001, began like countless others. Keller went to work. He spent the day filling customers' orders at the grill. Everything seemed quite normal and routine, but it was not. Events were under way that would mark Michael Keller's rendezvous with death.

The conspirators gathered only a short distance from Keller's home. One of them knew Michael Keller. Eugene Swafford (Eugene Swafford or Swafford) coveted Keller's large-screen television set and stereo, knew that Keller lived alone, and believed that he would sweat out a living over a Ponderosa grill all afternoon. Swafford and his cohorts drove to Keller's home and brazenly broke into it during broad daylight.

To his grave misfortune, Michael Keller came home early on April 16, 2001.

For several days thereafter, he and his white Oldsmobile were missing. Police suspected foul play. Large pools of blood stained the floors of Keller's empty house, and the television set and stereo were gone, along with Keller's automobile and countless other items. It was particularly alarming that Keller was not heard from and was nowhere to be found.

Fortunately, Keller's car was ultimately abandoned only a short distance from where Eugene Swafford lived. Consequently, the police were able to break the case when they found Keller's car, wiped down and discarded. They canvassed the neighborhood where it was discovered and talked to an elderly woman named Mary Weaver (Mary Weaver or Weaver), who provided them with suspects. Weaver told them that she had seen her granddaughter's husband, Eugene Swafford, and his friend, Jeramey Brown, unloading numerous items from Keller's car in the early evening hours of April 16, 2001.

The police took Swafford into custody and interrogated him. Swafford confessed and implicated his wife, Sylena Sergerson (Sylena Sergerson or Sergerson), a friend named Allen Hozian (Hozian), and the defendant. Then, Swafford led authorities to Michael Keller's body. It

was bound in a series of sheets and blankets and was tightly wrapped with duct tape. The mummy-like remains had been dumped into an abandoned grain silo.

The cause of death became apparent when the wrappings were removed from Keller's body. A gaping cut traversed his throat, and his body was riddled with countless, and deep, puncture wounds. During the autopsy, X rays revealed the broken blade of a knife, lodged between two vertebrae deep within Keller's back. Swafford led police to where the remainder of the murder weapon, the knife's handle, had been tossed.

Keller had been savagely attacked with more than one knife blade. The wounds left by the knife blades allowed life's blood to drain from all the parts of Keller's body. Without his blood, he perished.

The future was not all that the slayers took from Michael Keller. They plundered his home and took his car. Most of the ill-gotten loot was taken to Mary Weaver's basement, where it was recovered by authorities. Sylena Sergerson was Weaver's granddaughter. Weaver allowed her, her husband Eugene Swafford, and their two small children to live with her.

Swafford, Hozian, and the defendant were charged with first-degree murder in the death of Michael Keller.[1] The State prosecuted Swafford first. He was convicted of the murder and sentenced to a 50-year prison term. The defendant was tried next.

Mary Weaver testified against the defendant at his trial. Her testimony placed the defendant in Keller's car on the day of Keller's disappearance. She saw him driving it. It also bore witness to him helping Swafford unload Keller's possessions from the car. Weaver told jurors that after she watched Swafford and the defendant carry numerous items from the white Oldsmobile into Weaver's basement, she watched them depart together in Keller's car. She noticed that they threw a few things away. After they left, she satisfied her curiosity and searched the trash can into which they had been throwing things. From her trash can she found and retrieved Keller's car registration and a black hat that bore the inscription "Ponderosa."

The State presented numerous witnesses who clearly established that Swafford and the defendant were driving around Granite City in

---

[1]Sylena Sergerson, Swafford's wife, remained uncharged for a lengthy period of time. She was not charged with first-degree murder until after her husband provided key rebuttal testimony for the State in this case. In June of 2003, Sergerson was tried and convicted of first-degree murder. She currently serves a 28-year prison term. Eugene Swafford was a key prosecution rebuttal witness at her trial.

Keller's car on the evening of April 16, 2001. One of the witnesses testified that Swafford and the defendant wanted to borrow his truck to retrieve an entertainment stand. Such a stand had been left behind at the murder scene. Another witness testified that the defendant phoned him on April 17, 2001, and offered to sell him a television set like the one missing from Keller's entertainment stand. The State also presented surveillance videotapes made at the Alton Square Sears store the night of April 16, 2001. The tapes showed Swafford and his wife, along with the defendant, shopping at the store. Swafford purchased several items of clothing with Keller's credit card that night. The defendant was arrested wearing some of the clothing from those purchases. The rest of the items purchased with Keller's credit card were collected from Mary Weaver's basement, where Swafford, Sergerson, and their children lived.

The State did not offer any direct evidence of guilt in its case in chief. There were no uninvolved eyewitnesses to the residential burglary or to the murder. In addition, there was no physical evidence to link the defendant to the crimes. Nothing was found at Keller's home, at the grain silo, inside the car, on the murder weapon, or on Keller's body that would establish that the defendant was ever inside Keller's home or in contact with Michael Keller.

The State did offer the testimony of the defendant's cellmate at the Madison County jail. He spoke to a series of self-incriminating statements made to him by the defendant while they shared a two-man cell awaiting trial. He also authenticated and identified tape recordings and documents that corroborated his testimony. The sole question that we must decide arises from the use of this evidence. It will be discussed at length later in this opinion.

The defendant testified at his trial. There was no attempt made in advance of that testimony to prevent the use, or even to limit the extent of the use, of the defendant's prior criminal history. See *People v. Williams*, 161 Ill. 2d 1, 39, 641 N.E.2d 296, 312 (1994); *People v. Montgomery*, 47 Ill. 2d 510, 515, 268 N.E.2d 695, 698 (1971). In fact, defense counsel conceded that the defendant's criminal history could be used by the State to impeach the defendant's testimony. Evidently, because of this concession, defense counsel felt it necessary to elicit all the defendant's rather extensive criminal past. After detailing several criminal convictions, the defendant testified to his most recent one. It was a particularly prejudicial conviction, because it was for a residential burglary that the defendant committed with Eugene Swafford. The defendant told the jury that they both had been sent to prison for it.

Defense counsel also brought out that the defendant had only

been released from prison for a short time when he was arrested for the residential burglary and murder for which he stood trial. Thereafter, counsel called for the defendant to detail his brief work history between his release from prison and his arrest. It is not at all clear why counsel felt it necessary to elicit that testimony. It obviously bore witness to the defendant's ever-present criminal bent.

Thus, jurors learned that upon his release from prison, the defendant landed a job working at his stepfather's produce company for $11 per hour but that, soon thereafter, he chose to work at a Brooklyn, Illinois, nightclub called Mustang Sally's, where he was able to earn additional cash from brokering illegal drugs. The defendant's testimony also implied that he dealt in brokering sex, as well as drugs. The defendant testified that, from time to time, a number of women would give him unspecified amounts of cash. The defendant did not explain the generosity.

Thus, defense counsel elicited the defendant's preference for supporting himself through illegal activities. While the defendant readily admitted such a predisposition, he denied any participation in the burglary of Keller's home or in the stabbing death of Michael Keller. He admitted to being with Swafford and Sylena Sergerson at the Alton Square Sears store on the evening of April 16, 2001, and to riding in Keller's car. He did not directly address Weaver's testimony but implied that he might have handled some of Keller's property. The defendant told jurors that Swafford offered him some of Keller's possessions in return for forgiving a $1,400 drug debt incurred by Sylena Sergerson for cocaine that the defendant had fronted to her. Finally, he testified that he had nothing to do with the burglary of Michael Keller's home or with the events that led to Keller's death.

The defendant called several witnesses who offered a corroboration of the defendant's explanation of his whereabouts on the day of Keller's disappearance. However, the defendant's explanation did not account for every minute and hour of the day.

After the defense rested, the State called Eugene Swafford to rebut the defendant's testimony. Swafford, who had been previously convicted and sentenced to a 50-year prison term, was still pursuing a direct appeal at the time. It is unclear how he was made to appear without counsel present or how the State was able to procure him as a witness, while he still pursued legal relief from what the State had done to him.

When Judge Hackett admonished the unrepresented Swafford, he asked for a private, off-the-record audience with the prosecutor. It was allowed. Thereafter, he waived his fifth amendment right against self-incrimination and testified under oath that he had participated in the

residential burglary and the murder of Michael Keller, along with the defendant, Hozian, and his wife. He denied that anything was offered in return for his self-incriminating testimony. He also claimed that he did not expect any favor from the State in exchange for giving it.

Swafford told jurors that the defendant had initiated the knife attack on Michael Keller and that the defendant was solely responsible for all the injuries Keller sustained. According to Swafford, the defendant decided to arm himself with two knives from Keller's kitchen. Swafford claimed that when the first knife broke off in Keller's back, the defendant employed the second knife to finish the attack.

Swafford detailed how they wrapped Keller's body in sheets and blankets and bound them to it with duct tape. He detailed the trek to the grain silo. The jury learned from Swafford how he, Hozian, and the defendant disposed of Keller's body.

Swafford disavowed any direct participation in the crime's brutality and violence.

The foregoing facts detail, in general, the evidence that produced the guilty verdict and the additional finding that brutal behavior indicative of wanton cruelty had accompanied the murder.

We now turn to the testimony of Demond Spruill (Spruill or Demond Spruill). Spruill was a fellow inmate with whom the defendant shared a Madison County jail cell while he awaited trial. Spruill was also a pretrial detainee, unable to post bail on unrelated charges of armed robbery, conspiracy to commit home invasion, aggravated discharge of a firearm, and unlawful possession of a weapon by a felon.

Spruill claimed that during their jailhouse stay together the defendant confessed to his murder charge. Spruill further claimed that the defendant solicited his assistance in a plot to obstruct the prosecution's quest for justice. He testified that the defendant wanted him to silence prosecution witnesses. According to Spruill, the defendant asked him to murder Mary Weaver and to threaten and intimidate other prosecution witnesses. Spruill was supposed to convince certain witnesses that they should either refuse to testify or testify falsely in order to protect the defendant.

Spruill's testimony drew considerable strength and credit from a series of eavesdropped conversations with the defendant, collected at a time when Spruill was secretly working for the State. His credibility was also bolstered by three documents—exhibits admitted into evidence at the defendant's trial. Spruill identified the documents as a coded list of witnesses that the defendant wanted contacted and two maps of Granite City, created by the defendant to guide Spruill to

Weaver's home and to a home where Spruill could collect his fee for killing Weaver.

Twenty-five conversations between the defendant and Spruill, made by Spruill at the prosecution's behest, were covertly overheard and tape-recorded. Two of the tape-recorded conversations were admitted into evidence at the defendant's trial. The tape recordings corroborated Spruill's claim of a plot to kill and to threaten prosecution witnesses. They also corroborated testimony that the defendant had created a coded list of witnesses to enable his communication with Spruill about the ongoing plot while using monitored telephone lines at the Madison County jail.

Thus, jurors were told that the defendant's preferred method of defense on the murder charge was to procure the help of a fellow criminal to commit another murder, along with intimidation of State witnesses, obstruction of justice, and subornation of perjury. The State introduced, and the jury heard, tape recordings of the defendant's self-incriminating statements, aimed at furthering those ends.

Spruill gathered this additional evidence of the defendant's guilt as an arm of the prosecution, at a time when the defendant was indicted, arraigned, and represented by counsel. Thus, the defendant unwittingly provided the prosecution with recordings of himself saying things that evinced consciousness of guilt on the pending murder charges, while his legal representative slept, totally unaware of the fact that the prosecution had decided to contact his client and have a few words with him. The defendant uttered more than a few self-incriminating words into a State-sponsored microphone attached to a dedicated line at the Granite City police department, at a time when the sixth amendment to the United States Constitution guaranteed counsel's presence during any communication between State agents and the defendant. See *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964); see also *Maine v. Moulton*, 474 U.S. 159, 88 L. Ed. 2d 481, 106 S. Ct. 477 (1985).

The self-incriminating statements, the witness list, and potentially the two maps were harvested by Spruill for use against the defendant in this murder prosecution. Spruill had clearly joined the prosecution team when most, or all, of that evidence was collected. Therefore, that evidence was gathered in violation of the defendant's sixth amendment right to counsel. It was clearly vulnerable to a suppression order. However, no request for one was ever made.

Trial counsel's failure to prevent the admission of the damaging tape recordings, other incriminating statements made to Spruill after he came aboard the prosecution team, and the three documents purportedly prepared to assist Spruill in his efforts to further the

defendant's obstruction-of-justice plot frames the question presented to us on appeal. We must decide whether the defendant received the Constitution's promise of effective legal assistance, where his lawyer failed to prevent the admission of evidence developed in violation of that sixth amendment right.

Initially, we need to dispel the State's argument that counsel could not be ineffective for failing to raise a sixth amendment challenge because there simply was no constitutional violation to raise. The State's argument is essentially as follows. The unrepresented postindictment communication between Spruill and the defendant dealt only with the defendant's solicitation of other crimes, and not the crime with which he was charged. Since Spruill either only prompted or otherwise invited incriminating statements about solicitations to hamper the murder prosecution, and not inculpatory statements about the murder itself, the damaging statements only dealt with uncharged conduct, unprotected by the right to have existing counsel present. Self-incriminating statements indicative of the defendant's desire to murder and intimidate key prosecution witnesses to the pending charges were not entitled to the shield that sixth amendment protections afford.

Thus, we are told that the prosecution can obtain self-incriminating statements that circumvent an accused's right to counsel and that it can use those statements against the defendant to convict on charges pending when the statements were surreptitiously obtained, so long as the incriminating statements do not constitute direct admissions of guilt or complete confessions to the crimes charged. That the statements served to inculpate the defendant on the murder charges, that the statements were obtained for that purpose, and that the statements were, in fact, used to prove, beyond a reasonable doubt, that the defendant committed the murder with which he was charged is flatly unimportant. According to the State's position, unless the incriminating statements, secretly elicited in the absence of counsel, involved details about the pending murder offense, their procurement and use did not offend the sixth amendment right to counsel.

We would not be troubled by the admission of the self-incriminating statements, and the supporting documents, in any ensuing prosecution for solicitation to commit murder, solicitation to intimidate State witnesses, solicitation to obstruct justice, or solicitation to suborn perjury. None of those offenses was charged at the time of Spruill's endeavors to gather self-incriminating statements. The defendant had no existing constitutional promise of a legal buffer between himself and the State with regard to uncharged conduct. However, what hap-

pened here was an intentional effort to bolster the State's case against the defendant on pending murder charges, by intentionally disregarding the attached constitutional right to counsel. The State engaged in an affirmative effort to surreptitiously obtain self-incriminating statements that would help prove that the defendant had committed the murder with which he was charged. And the series of recorded statements was obtained from the defendant without the consent, knowledge, or presence of the defendant's appointed counsel.

The sixth amendment's right to counsel guarantees protection against what happened here. The guarantee constrained the State from intentionally procuring self-incriminating statements for use against the defendant on the pending charges. It does not matter that the statements did not directly admit any kind of guilt on the murder charges. Recorded statements that established the defendant's desire to employ murder and intimidation of key prosecution witnesses as his primary means of defense were every bit as inculpatory as direct admissions about involvement in the charged conduct.

The self-incriminating statements were obviously procured for use, and were indeed used, to advance the State's case on charges to which the constitutional right to counsel had attached. To the extent that it matters to the inquiry, which we are not convinced that it does, the record clearly belies any suggestion that the evidence gathered was merely the innocent by-product of efforts to further investigate the potential solicitation offenses. When defense counsel, unmindful of the constitutional violation, requested Judge Hackett to bar the prosecution from using the tape recordings because "their prejudicial effect would outweigh their probative value," the prosecutor promptly responded:

"MR. JENSEN: [The] evidence of solicitation would come in as a motive or knowledge and intent as to murder. *** Demond Spruill will indicate that *** the defendant became aware that Spruill was about to be released and asked him to contact some of the witnesses and, indeed, take care of or kill Mary Weaver and confront Salena [sic] Sergerson. Both of those are key witnesses in the State's case. And for that reason, I think that that goes towards his motive. It goes toward his knowledge. It goes toward his intent. The fact that he is attempting to have the witnesses killed for those reasons, Your Honor[—]I think the tapes themselves are admissible. I think that the testimony of Mr. Spruill is, in fact, admissible."

Unquestionably, when Spruill signed up to gather evidence and engaged in efforts to corroborate the defendant's desire to kill and intimidate key State witnesses, the State fully intended to use the ad-

ditional evidence in the murder prosecution. The plan to do so was based upon a number of theories why, despite being evidence of another crime, the defendant's solicitation to commit murder and obstruction of justice would be admissible.

As a point in fact, none of the prosecutor's reasons for admitting the statements was correct. See *People v. Lenley*, 345 Ill. App. 3d 399, 802 N.E.2d 315 (2003). While this murder prosecution, and its reliance upon the testimony of Weaver, could be admissible at a trial for the solicitation of Weaver's murder, in order to establish the motive behind the solicitation, the converse is simply not true. Solicitations to kill and intimidate prosecution witnesses have no bearing whatsoever upon the motive behind this murder or upon the state of mind with which it was committed.

Notwithstanding, the desire to effect a key prosecution witness's death, and the defendant's willingness to use murder as a means of a defense to his pending murder charge, constituted powerful evidence of his consciousness of guilt. Indeed, it spoke volumes about his guilt and was admissible for that purpose. Any juror hearing that evidence, and possessed of common sense, would wonder, What innocent charged with murder would resort to murder as his path to exoneration and freedom?

As a by-product of their admissibility to show this aspect of the defendant's state of mind, the tape recordings provided significant corroboration of Spruill's testimony, not only about the solicitations, but about everything else. The fact that the recordings did not provide self-incriminating statements about the murder itself does not mean that the recordings' contents were not about, or highly relevant to, this murder charge.

The constitutional foundation for the sixth amendment violation that has occurred here was laid more than 40 years ago. When law enforcement agents secretly obtained incriminating statements from Winston Massiah after he was indicted, arraigned, and represented by counsel, the United States Supreme Court held:

"[Massiah] was denied the basic protections of [the right to the assistance of counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206, 12 L. Ed. 2d at 250, 84 S. Ct. at 1203.

Although this basic holding has been refined over the years, it has remained firmly intact. See *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980); *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981); *Maine v. Moulton*, 474 U.S. 159,

88 L. Ed. 2d 481, 106 S. Ct. 477 (1985). Despite the well-settled nature of the law that pertains to postindictment statements made in the absence of counsel, no one seemed aware of it in terms of what was done here—not the police, not the prosecutor, not the judge who issued the eavesdrop order, and most important of all, not the defendant's lawyer.

In *Maine v. Moulton*, Perley Moulton and Gary Colson were codefendants indicted on identical theft charges. *Moulton*, 474 U.S. at 162, 88 L. Ed. 2d at 487, 106 S. Ct. at 480. In one of many conversations between the two men while they awaited trial, Moulton suggested that he and Colson murder a key prosecution witness. Colson passed on this potential defense strategy to the police and agreed to join with them in an effort to gather more evidence of Moulton's guilt. *Moulton*, 474 U.S. at 163, 88 L. Ed. 2d at 488, 106 S. Ct. at 480. Tape recordings of subsequent conversations between Colson and Moulton recorded numerous incriminating statements that were admitted into evidence at Moulton's trial. *Moulton*, 474 U.S. at 163-66, 88 L. Ed. 2d at 488-89, 106 S. Ct. at 480-82.

The United States Supreme Court explained that "[t]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State" and that "this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right." *Moulton*, 474 U.S. at 176, 88 L. Ed. 2d at 496, 106 S. Ct. at 487.

Justice Brennan wrote:

"The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation.] However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Moulton*, 474 U.S. at 176, 88 L. Ed. 2d at 496, 106 S. Ct. at 487.

In response to the State of Maine's suggestion that the sixth amendment violation could be excused because there were "other, legitimate reasons for listening to Moulton's conversations with Col-

son, namely, to investigate Moulton's alleged plan to kill [a key prosecution witness] and to insure Colson's safety" (*Moulton*, 474 U.S. at 178, 88 L. Ed. 2d at 497, 106 S. Ct. at 488), Justice Brennan wrote:

"The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. *** Consequently, incriminating statements *pertaining to pending charges* are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." (Emphasis added.) *Moulton*, 474 U.S. at 179-80, 88 L. Ed. 2d at 498-99, 106 S. Ct. at 489.

The words "pertaining to pending charges" in the above-quoted passage are highlighted because the State uses those words in formulating its position that no constitutional violation occurred. The State reads "pertaining to pending charges" to mean that only statements addressing the murder's details are required to be excluded. The State maintains that only statements about how or why the murder was committed would *pertain* to the pending charges. This view of Justice Brennan's words allows the State to contend that any statements about killing witnesses to the pending murder prosecution do not pertain to the murder and that, therefore, their admission did not offend the sixth amendment.

We believe that Justice Brennan used the word "pertain" as it is commonly understood. "Pertain" is clearly the right word for saying that the incriminating statements have to be relevant and relate to the pending charges. In other words, the incriminating statements have to meet the evidentiary test for admissibility at trial on the pending charges. They have to be relevant, and capable of use against the defendant, in obtaining a conviction on filed charges upon which the

defendant is legally represented. That was obviously the case here. Clearly, a sixth amendment violation occurred.

The fact that 25 recorded overhears between the defendant and Spruill, and the creation of a witness list and maps, violated the defendant's sixth amendment right to counsel does not automatically require the reversal of his conviction. We must determine whether trial counsel's failure to raise the violation, in order to exclude the use of the illegally obtained evidence, constituted ineffective assistance of counsel. This is a constitutional question that must be framed under the standard provided in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a standard adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984).

The *Strickland* standard has two prongs. First, the defendant must show that counsel's performance was constitutionally deficient. Second, the defendant must show that the deficient performance prejudiced the defense.

As a general rule, defense counsel are presumed to pursue sound trial strategies. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. We note that the need to engage this presumption necessarily arises only after defense strategies have failed. It is a presumption afforded by courts of review in cases where the prosecution has prevailed and the defendant is trying to have his conviction overturned. Hence, all ineffective-assistance-of-counsel claims necessarily deal with professional help that did not work. Obviously, the strategies employed must be shown to be more than unsuccessful in order to overcome a presumption of soundness. *People v. Faulkner*, 292 Ill. App. 3d 391, 394, 686 N.E.2d 379, 382 (1997).

The presumptive soundness of an attorney's performance gives way to a finding of representation's deficiency only where no reasonably effective criminal defense attorney, confronting trial's circumstances, would engage in similar conduct. See, *e.g.*, *People v. McMillin*, 352 Ill. App. 3d 336, 816 N.E.2d 10 (2004) (defense counsel elicited a lengthy criminal past, including multiple past convictions identical to the crimes charged, in order to establish that the defendant would plead guilty if he were guilty and would only invoke his right to a jury trial if he were innocent). The Constitution's guarantee of "assistance of counsel" calls for "reasonably effective assistance." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

"Criminal defense lawyers must assist defendants in a way that the [C]onstitution's guarantee to 'assistance of counsel' contemplates." *People v. Lefler*, 294 Ill. App. 3d 305, 310, 689 N.E.2d 1209, 1213 (1998). The promise of reasonably effective legal help contemplates the kind of help that curbs prosecutorial excess and ensures a process

to verdict achieved within the bounds of constitutional constraint. Reasonably effective criminal defense attorneys raise constitutional guarantees, when appropriate, to suppress damning evidence procured in violation of those guarantees. See *People v. Moore*, 279 Ill. App. 3d 152, 159, 663 N.E.2d 490, 496 (1996) (defense counsel failed to obtain an order suppressing numerous incriminating statements improperly elicited without the required fifth and sixth amendment admonitions).

Here, trial counsel failed to invoke the defendant's sixth amendment rights to suppress self-incriminating statements and three seriously incriminating documents. The State's primary counter to this failure is the argument that sixth amendment rights were never violated. We have already addressed that position.

The State also points out that defense counsel did try to exclude the tapes and their contents, albeit under other rules of evidence designed to prevent the State from presenting evidence of other crimes. This argument only serves to underscore counsel's deficiency. Aware of the "highly prejudicial" nature of the tape recordings, counsel asserted a challenge that the law would not support. The trial judge, acting within the discretion that he possessed, could, and did, deny counsel's request. At the same time, a constitutional challenge existed that would have achieved counsel's desired objective. The pursuit of an unsuccessful, and ill-conceived, strategy, to exclude evidence, when a legal avenue existed that could produce the desired result, cannot be deemed sound. Counsel knew that the exclusion of the recordings could help avoid a conviction, but counsel lacked the legal knowledge to raise a challenge that would have clearly provided that help.

In addition, because a motion to suppress was never filed and an evidentiary hearing was never conducted, the extent to which the sixth amendment violation tainted the exhibits, along with Spruill's testimony, has never been ascertained. The precise moment at which Demond Spruill ceased being an inmate acting on his own behalf and became a State agent acting at the behest of the prosecution remains unknown. Therefore, the precise point in time when sixth amendment rights attached remains unknown, along with how much evidence should actually have been excluded. It appears, based upon Spruill's trial testimony, that the coded list of witnesses was created at a time when Spruill was on board the prosecution's team. However, while we can speculate that the maps were created in anticipation of Spruill's imminent release from jail, a circumstance indicative of state agency, it remains unclear whether the maps and substantial portions of Spruill's testimony could have also been excluded.

Had trial counsel been aware of the proper means to suppress

evidence surrounding Spruill's testimony, the coded list of witnesses, People's Exhibit 162, and all the recorded statements would have been suppressed. Spruill testified that the coded list was prepared in order to facilitate telephone conversations between the defendant and Spruill on monitored jail telephones after his imminent jail release. He testified that he was released from jail after he obtained it. Spruill's release was State-sponsored in order to conduct the eavesdrop operation. Spruill's release would not have been procured until after he was under the State's direction and working for it.

Had trial counsel been aware of the sixth amendment violation, the two maps of Granite City, People's Exhibits 163 and 164, and Spruill's testimony about the jailhouse confessions might also have been suppressed.

Spruill testified that the two maps had been drawn by Spruill and the defendant to assist Spruill in carrying out Weaver's death. Spruill identified People's Exhibit 163 as a map to Weaver's house. People's Exhibit 164 was a map to another Granite City residence, a house that the defendant allegedly provided as consideration for the murder contract. According to Spruill, he was supposed to collect his fee for killing Weaver by breaking into the house and stealing his fee.

While it appears obvious from Spruill's trial testimony that he was working for the prosecution when the witness list was made, at a time when he was getting ready to leave the Madison County jail, the timing on the creation of the maps is not as clear.

Thus, inculpatory taped statements demonstrative of the defendant's guilt, along with documentary corroboration of the plot involving obstruction of justice and murder, were admitted into evidence against the defendant, as a result of trial counsel's failure to recognize the sixth amendment violation. Under these circumstances, we find that trial counsel's assistance was constitutionally deficient. Because his performance was not objectively reasonable, the defendant did not receive the kind of reasonably effective assistance that the sixth amendment requires.

We turn to an examination of whether the defendant has demonstrated prejudice as a result of counsel's deficient performance.

To succeed on a sixth amendment claim of ineffective assistance of counsel, the defendant must show that there is a reasonable probability that, but for counsel's professional shortcomings, the result of the proceeding could have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability means a probability sufficient to undermine confidence in the outcome of the case. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Under this test for constitutionally ineffective assistance of counsel, we are constrained from providing a defendant relief solely upon the basis of his attorney's substandard performance. The test measures the performance against its potential effect on the outcome of the case. Therefore, even where counsel's mistakes are egregious, we are required to examine them in the context of all the evidence in the case. We must determine whether a different outcome was a reasonable likelihood in the absence of counsel's errors. See *Lefler*, 294 Ill. App. 3d at 311-12, 689 N.E.2d at 1214-15.

The State concedes, for the sake of argument, that a sixth amendment violation occurred. Notwithstanding, it maintains that there was very little, if any, prejudice to the defendant as a result of counsel's failure to employ the violation to suppress evidence. The State argues that the defendant's ineffective-assistance-of-counsel claim must ultimately fail simply because the illegally obtained evidence did not produce enough harm to potentially alter the trial's outcome. According to the State, there was plenty of evidence to support the trial's outcome, apart from the evidence developed for the State by Demond Spruill.

We reiterate and emphasize that the question of prejudice, in the context of an ineffective-assistance-of-counsel claim, does not simply call for a discount of the tainted evidence and a determination of whether the remaining evidence was legally sufficient to establish guilt. See *Moore*, 279 Ill. App. 3d at 161, 663 N.E.2d at 498. The question that needs to be answered now, given the evidence improperly admitted because of counsel's failure, is whether we are confident that the trial's outcome would have been identical to the outcome reached, had counsel performed to the standard that the Constitution demands of professional advocates. This is never an easy question to answer. It is particularly difficult here, where the State sought and procured a jury finding beyond the common elements that compose the offense of first-degree murder.

Thus, we ask whether we can confidently say that this jury would have unanimously determined, beyond a reasonable doubt, that this defendant committed first-degree murder and that he did so in a brutal and heinous way indicative of wanton cruelty, had counsel successfully raised the sixth amendment violation.[2] We answer that we cannot. It seems reasonably probable, likely but not certain, that all 12 jurors

---

[2]Since the added finding was legally unnecessary to the trial judge's imposition of an extended-term sentence, Justice Welch deems it unimportant to the ultimate punishment determination and, hence, unimportant to our analysis of a changed outcome in the absence of professional error. We are not

would not have decided this case in the same manner without having seen and heard the documents and the tape-recorded statements created by Demond Spruill. The trial would have been vastly different in the absence of evidence that provided undeniable support for Demond Spruill's testimony and its truthfulness.

Initially, we reiterate that the degree to which Demond Spruill's testimony was capable of exclusion depends upon when he began working at the behest of the State, a determination that has never been made, due to counsel's shortcoming. Spruill's trial testimony does not fix the precise moment when he began to work for the prosecution. We think it entirely possible that Spruill was working for the State from the moment that he was placed into the defendant's cell, in which case none of his testimony would have been admissible.

Nonetheless, we choose to assume, for purposes of this decision, that most of Spruill's testimony about jailhouse conversations was developed by Spruill before he contacted authorities and went to work for them and that he could have given uncorroborated testimony about most of the things to which he testified, based upon his initial acquisition of the self-incriminating statements before becoming a State actor.

Without the use of the illegally obtained evidence that provided irrefutable backing for Spruill's word, it would have been entirely reasonable to harbor at least some doubt about the truthfulness of his testimony. While the jury might not have unanimously decided to acquit the defendant, a reasonable probability exists that the State would not have obtained the same result. Not all the jurors may have been willing to pronounce the defendant guilty of first-degree murder, and additionally find that his behavior was brutal and heinous, based solely upon the circumstantial evidence of guilt augmented by the uncorroborated word of Demond Spruill.

Moreover, it is impossible to say how the trial would have played out without the tapes and the documents. The defendant might not have testified, a possible circumstance that we believe would have

prepared to say what kind of sentence Judge Hackett would have imposed absent a jury finding that this murder had been accompanied by brutal and heinous behavior indicative of wanton cruelty. The State obviously considered the finding important. It did not need to seek the added finding in order to seek extended-term punishment. Notwithstanding, it pursued and obtained the finding and argued its existence as a reason for the judge to impose a harsher extended-term sentence. Judge Hackett stated that his decision to impose an extended-term sentence was based, in part, upon the finding. We think that a reasonable likelihood exists that, absent the finding, the defendant's sentence might have been different.

significantly improved his chances of obtaining a different result. And without the defendant's testimony to rebut, the State could not have called the only witness to offer direct evidence of guilt, Eugene Swafford.

The confirmation of a death plot, hatched by the defendant to silence a key prosecution witness, designed with coded lists and charts, to enable communication and direction from the Madison County jail, was clearly the most important part of the State's case. The tape recordings and the documents provided the dynamic that transformed an inherently suspect witness into an entirely believable one. They provided undeniable verification of Spruill's claims, lending credence to all his other testimony about how the defendant detailed his role in the murder—detail that might well have been instrumental in some juror arriving at the conclusion that the defendant's behavior had been brutal and heinous, indicative of wanton cruelty.

The tape recordings and the documents discounted the dishonesty that pervades Spruill's character. They removed quite natural doubts about the self-interest that necessarily accompanied his reasons for testifying. While Spruill's testimony might have been motivated by self-preservation in the face of serious pending charges, the tapes and the documents proved that he was not making up things to feather his nest. We reiterate that which is manifest about the illegally obtained evidence. The tapes and the documents confirmed Spruill's testimonial claims in a way that transformed them into entirely believable, damning evidence.

Justice Welch does not share our view of this evidence and its significance to the trial and its outcome. He remains confident that the outcome would not have changed if the State's case rested entirely upon the other circumstantial evidence presented at trial. The State's ability to establish that the defendant shared the use of Keller's car on the day that Keller disappeared, that the defendant knew that the car was stolen, that the defendant benefited from Swafford's use of Keller's credit card, that he and Swafford tried to obtain a truck to return to Keller's home and retrieve an entertainment stand, that he helped Swafford store all of Keller's property in Weaver's basement, where Swafford was living, and that he tried to fence Keller's television set was indeed significant circumstantial evidence of guilt. Notwithstanding, we do not believe that, standing alone, it would necessarily have satisfied 12 people beyond a reasonable doubt that the defendant was guilty of a first-degree murder or that it was a murder that he committed in brutal and heinous fashion. Without Spruill's corroborated testimony, coupled with Swafford's rebuttal testimony, the defendant's participation in Keller's brutal murder

requires a conclusion from circumstantial evidence of guilt that some jurors might not have wanted to make.

A true understanding of the tainted evidence's value, and why it might well have had a profound effect on the outcome of this case, requires a look at how Spruill's testimony was vulnerable to attack, absent the illegally obtained corroboration.

When the State planned the eavesdrop-and-tape-recording operation with Spruill, it wanted to create hard evidence to credit Spruill's claims. In all probability, the dire need for corroboration is what set a course in violation of constitutional rights. The prosecution had to know that Spruill's future testimony would be hampered by his many past performances, his unseemly criminal record, and the severity of his pending charges. Spruill was going to need the defendant's self-incriminating statements recorded on tape, the coded witness list, and the two maps, in order to have any credibility. Without solid corroboration, Spruill's claims were going to be sorely tested.

When we turn to an examination of Spruill's credibility, absent the tapes and the documents, our most immediate observation is the striking relationship between Spruill and Madison County prosecutors over the course of the past decade. Madison County prosecutors appear to have forged a symbiotic alliance with Spruill, an understanding of mutual benefit on matters criminal in nature.

This was not the first high-stakes Madison County murder trial at which Spruill appeared as a key witness for the State. It was not the second or even the third time that Spruill awaited trial on serious felony charges of his own, when, to his good fortune, he happened to land in a two-man Madison County jail cell with a pretrial detainee charged with murder. Quite remarkably, against astronomical odds of random selection, this case marked the sixth time that Spruill and an accused whom Madison County prosecutors very much wanted to convict of murder ended up sharing a common cell. And, as the fates would have it, Spruill claimed on all six occasions that the common cell proved to be a confessional.

This was the sixth murder prosecution, spanning an eight-year period of time, in which prosecutors served up testimony from Demond Spruill. Spruill was always someone who, by coincidence, found his way into the cell of a Madison County pretrial detainee charged with first-degree murder. Spruill faced pending charges every time he testified. On every occasion, he claimed that his fellow inmate gratuitously shared all the details of his guilt with him. The man who prosecuted this case has used Spruill as a witness on many occasions. During his testimony, Spruill admitted under cross-examination that

he has provided Keith Jensen with eight or nine jailhouse confessions over the course of their long-standing relationship.[3]

We are not in possession of the records to check out all of Spruill's testimonial career in Madison County. However, we are hopeful that his prior efforts on behalf of the State are not marked by the kind of denials made here—that his testimony was not in any way motivated by self-interest. We hope that Madison County prosecutors have not repeatedly elicited sworn testimony similar to that given here— testimony that claimed that the defendant's confession, and the assistance given to the prosecution, was only provided out of a sense of morality, rather than any hope of leniency, or expectation of favorable treatment on pending charges. We would like to think that jurors have not been told repeatedly, for almost a decade, that Spruill expects nothing of value, and receives nothing of value, in return for his testimony. History belies such a conclusion. Madison County prosecutors have allowed Demond Spruill a license to arm himself, plot home invasions, and shoot at people over the course of his career as a Madison County prosecution witness. Unquestionably, Spruill has been compensated handsomely for his testimony, with the most precious of commodities—his freedom.

Without significant corroboration of his core testimonial claims, at least a few jurors might have cringed, taken pause, and tuned out any further testimony, after Spruill insisted that he was only helping with the prosecution because he disliked anyone who wanted an elderly woman shot and killed. Spruill's unsavory past mocks his claim of noble purpose, for his criminal history belies any inkling of conscience or concern with the distinction between good and evil or right and wrong.

That criminal history, as presented to us, is obviously incomplete and somewhat confusing. However, we examine what we have been given, because it further demonstrates Spruill's vulnerability as a witness. In the absence of corroborating tapes and documents, Spruill's

---

[3]One could almost take the position that Spruill was a State agent when officials decided to place him in another murder suspect's jail cell. By this time, the authorities would have known Spruill's gambit. Spruill was their man to obtain a jailhouse confession when they needed one. By this time, Spruill would have also known the score. Again facing serious felony charges, and again finding his way into a two-man cell with someone whom Keith Jensen very much wanted to convict of murder, Spruill could have easily surmised that he was put there on a mission. Having lived the experience as many as nine times before, and having developed an understanding of how his Madison County release program worked, Spruill really would not require any instruction from State handlers.

criminal past would have rendered Spruill's credibility inherently suspect. It would also have clearly demonstrated his self-interest in testifying.

Spruill was convicted of felony theft in 1991. He served very little of his sentence of probation before he was caught, prosecuted, and convicted of burglary. In 1992, Spruill was sentenced to a three-year prison term for burglary and for the 1991 theft, after his probation was revoked. In 1993, Spruill was prosecuted for and convicted of attempted murder. After being convicted of three separate felonies in less than a three-year time span, the last conviction involving an effort to murder someone, Spruill was somehow sentenced to a four-year prison term, two years less than the mandatory minimum term required for attempted murder.

Presumably, the four-year prison term reflected on his criminal history sheet was accurate. It is unclear how much of the four-year sentence Spruill served. However, he was clearly at large again by 1995, when he armed himself with a handgun and shot at someone. He was prosecuted and convicted of aggravated discharge of a firearm in 1995. Having been convicted of four separate felonies inside of four years, with the last two convictions involving seriously violent crimes, Spruill miraculously received the bare minimum prison term of four years' imprisonment. There is no way of knowing how much of the four-year prison term Spruill was required to serve. However, he was clearly out and about in Madison County by at least early 1997, when he promptly found himself facing a new round of criminal charges.

Spruill was prosecuted and convicted of unlawful delivery of a controlled substance, cocaine, in 1997. According to Spruill's criminal history sheet, he was sentenced to eight years in prison for dealing drugs.

The other charge leveled against him in 1997 was for armed robbery. That charge was one of the four pending felony charges that Spruill faced when he testified against the defendant. We are unaware of how the State has disposed of that charge.

Somehow, Spruill did not serve an eight-year prison term. How he managed to evade his punishment is unclear. It was simply impossible for him to receive an eight-year prison sentence in 1997 and serve that sentence to completion by July of 1999. Moreover, even if a two-year prison stay could somehow satisfy an eight-year term of imprisonment, there would still be a mandatory supervised release period that subsequent events would have had to reflect.

On July 22, 1999, Spruill was not in prison. He was again on the streets of Madison County, where an Alton police officer searched him and found another firearm. Spruill's criminal history sheet does not

reflect any action by the Department of Corrections after Spruill's arrest.

Madison County prosecutors did not charge Spruill for 1½ years. Then, on January 4, 2001, an unlawful-possession-of-weapons charge was lodged against him for the incident, along with two other charges. The State also charged Spruill with conspiracy to commit home invasion. The charge alleged that Spruill had obtained two handguns and three ski masks in furtherance of the plot to invade someone's home. In addition, the State charged Spruill with aggravated discharge of a firearm. The charge alleged that he had fired a .40-caliber semiautomatic handgun at someone. If the charges were all true, the criminality all occurred while Spruill was on bond for armed robbery.

Spruill testified at the defendant's trial that, despite his carrying guns, plotting home invasions, and shooting at people while on bond for a serious offense, his bond on the new charges was set at an amount that he could post. There was apparently no hold lodged by the Department of Corrections over his earlier drug-dealing conviction and sentence. Spruill told jurors that he did not honor his bond conditions and became a fugitive from justice. For months, he actively eluded the authorities. Sometime in August of 2001, he was arrested and confined in the Madison County jail. Shortly thereafter, jail personnel placed him in the defendant's cell.

When Spruill reported to an Alton detective another in a long line of jailhouse confessions, arrangements were made to allow for his release on his own recognizance. Despite his claim that he expected nothing in return for the confession that he could now provide, he did not again run from authorities. However, he did again arm himself with a handgun. While on recognizance bond, awaiting trials for armed robbery, conspiracy to commit home invasion, illegal use of weapons, and aggravated discharge of a .40-caliber semiautomatic handgun, Spruill was arrested in St. Louis, Missouri, and charged by federal authorities for being a convicted felon in possession of yet another firearm. Clearly, Spruill had violated the conditions of his bail release. He left the state without permission and committed another crime. However, the State did not initiate any new charges because of the bail violations.

November 13, 2003, was Demond Spruill's lucky day. Keith Jensen moved to dismiss all the pending charges brought against Spruill in January of 2001. Apparently, the dismissals were not due to a lack of evidence to support the charges. The Madison County form order of dismissal has a box to check if the dismissals are sought because of insufficient evidence. It was not marked. The reason for the dismissals, stated on the form order after a block designated "other," was

Spruill's assistance to other law enforcement agencies. The precise moment when Keith Jensen agreed to abandon the prosecution of the charges pending against Spruill when he testified against the defendant is unknown. So is what happened on the 1997 armed robbery charge.

In any event, Spruill's testimony was extremely vulnerable to attack, if left uncorroborated. His unrepentant criminality, juxtaposed with his remarkable ability to escape punishment for his evil ways, could have easily cast doubt upon his credibility. With a character that reflected dishonesty and utter disdain for things moral and law-abiding, anything Spruill said was suspect, particularly in light of his pattern of using jailhouse confessions as a means to his own selfish ends. There was no reason to believe that he did not expect to benefit handsomely from his testimony, when his sundry past performances always wrought substantial benefits in how he got treated.

Spruill's historical disregard for the law aggravated the criminality with which he was charged and clearly heightened his self-interest in once again providing testimony for the State. Spruill testified under threat of losing his freedom for a long time. His criminal career, coupled with the violent nature of the charged conduct, made another alliance with the prosecution imperative. Spruill desperately needed a prosecutor's friendly hand and was well-schooled in how jailhouse murder confessions worked to find one. There simply is not a shred of doubt that Spruill saw the defendant as a ticket to freedom the instant that he was placed in the defendant's cell. Without the tapes and the documents, at least some of the jurors might have harbored doubts about Spruill's claims and might have questioned whether they were elaborate lies cast by someone well-trained in how to lie in answer to his own problems with law enforcement officials.

Spruill's testimony also stood prey to the stigma that befalls professional witnesses. Spruill was not only a career witness for Madison County prosecutors; he was a career witness who harbored a significant bent for dishonest behavior. How difficult would it really be for a man of this ilk to bear false witness in exchange for his freedom? After all, Spruill evidenced no qualms about using gunplay and violence to obtain his selfish goals, exhibited no hesitation about breaking into other people's homes and stealing from them, and found it easy to engage in illegal drug-dealing.

Finally, the circumstances under which Spruill claimed to have heard the defendant confess made the confession inherently suspect. For a fifth time, Spruill offered testimony designed to improve Mr. Jensen's chances of winning a high-profile murder case. This was the sixth time that Spruill found his way into the cell of a Madison County

inmate charged with murder. Spruill was again housed with an inmate whose case was of a kind that drew attention—a case in which additional evidence would always be welcomed and appreciated. And a sixth jailhouse confession ensued.

It is not difficult to see why the State wanted to develop evidence that independently corroborated Spruill's testimony and established that his claims were unquestionably true. Spruill's naked testimony, stripped of corroborating tapes and documents, was not worth a lot. It had the potential to hurt the State's case as much as it might help it. However, with the corroborating evidence, Spruill's testimony provided the State with a riveting account of this crime's brutality, an account that became decidedly believable, despite its source. But for counsel's failure, the corroborating evidence would have been suppressed and a key component of the State's case in chief would have been missing. We are not confident that without it the State would have accomplished the same outcome in this case.

Accordingly, we conclude that the defendant was denied the right to effective assistance of counsel, a constitutional error that requires us to reverse the defendant's conviction and remand for a new trial.

Reversed; cause remanded.

HOPKINS, J., concurs.

JUSTICE WELCH, dissenting:

I respectfully dissent. In setting forth the standard by which to judge a claim of ineffective assistance of counsel, the Illinois Supreme Court has held that a defendant must prove that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense in that absent counsel's deficient performance there is a reasonable probability that the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). With regard to the second prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome. *Evans*, 209 Ill. 2d at 220. A reasonable probability of a different result is not merely a possibility of a different result. *Evans*, 209 Ill. 2d at 220. Although the majority posits what I deem to be the *possibility* of a different result in the case at bar, I do not share the majority's belief that any errors made by the defendant's counsel create a reasonable *probability* of a different result sufficient to undermine confidence in the outcome of the trial. Although I agree with the majority's position that in the context of an

ineffective-assistance-of-counsel claim, one must do more than simply discount the evidence that should not have been admitted and ascertain whether the remaining evidence was legally sufficient to establish guilt (358 Ill. App. 3d at 596, citing *People v. Moore*, 279 Ill. App. 3d 152, 161 (1996)), I do not believe that one must entirely discount the evidence that was properly before the jury, as the majority appears to do when it begins its analysis of the possible prejudice in this case. Even when one excludes all the evidence that might have been tainted, however remotely, by the alleged ineffective assistance of counsel—including all of Demond Spruill's testimony, the defendant's own testimony, and the testimony of Eugene Swafford in rebuttal— the following evidence was properly before the jury, and it stands to reason that this evidence should be considered carefully and thoroughly in any review of the proceedings as a whole.

As the majority itself notes in its facts section, though not in its analysis of the potential prejudice in this case, Sylena Sergerson's grandmother, Mary Weaver, testified that the defendant drove the victim's car up to her house on the day of the victim's disappearance. She also testified that she watched the defendant and Swafford, who was a passenger in the car, unload the victim's possessions from the inside of the car and from its trunk. Mrs. Weaver watched the defendant and Swafford carry numerous items from the car into her basement, and she heard the defendant state that he wanted $10 for speakers the men were unloading. She noticed that the men threw a few things away, and after the men departed her home in the victim's car, she satisfied her curiosity and searched the trash can into which they had been throwing things. She found and retrieved the victim's car registration and the victim's black Ponderosa work hat from her trash can.

The State presented numerous other witnesses who also clearly established that the defendant was driving around Granite City in Keller's car on the evening of April 16, 2001. One of those witnesses, Christopher Landreth, testified that the defendant and Swafford wanted to borrow Landreth's truck to move into the basement of Mary Weaver's home an entertainment stand that was too large to fit into a car. Although neither the defendant nor Swafford owned such a stand, crime scene photographs from the victim's home show such a stand, splattered with blood and surrounded by pools of blood. Another witness, Monte Morgan, who testified that he was a long-standing neighborhood acquaintance of both the defendant and Swafford, testified that on Wednesday, April 18, 2001, the defendant and Swafford were at Morgan's home when the subject of the victim's disappearance, which had just been broadcast on the local news, came up.

Morgan testified that both the defendant and Swafford got very quiet and then quickly left the home, uncharacteristically not saying as much as "bye or I'll talk to you later or nothing like that."

James Hollis, who characterized himself as a childhood friend of the defendant and Swafford, although, in his own words, he was "a better friend of [the defendant]," testified that on Tuesday, April 17, 2001, the defendant called him and asked him if he wanted to buy, or knew anyone else who would want to buy, a "big tv" for $400. The defendant owned no such television at the time, although the victim's entertainment stand, discussed above, was missing a large-screen television. The State also presented surveillance videotapes made at the Alton Square Sears store on the evening of the murder. The tapes showed the defendant, Swafford, and Sergerson shopping at the store. Swafford purchased several items of clothing with the victim's Sears credit card that night, including clothing for the defendant. Detective George McLaren of the Granite City police department testified that when the defendant was arrested, he was wearing clothing that matched the description of some of the clothing purchased at the Sears store with the victim's credit card, including a St. Louis Cardinals T-shirt, a pair of Nike shoes, a pair of Levi's jeans, and a Cardinals baseball cap. Sergerson later turned in other articles of clothing purchased that night at Sears. Charlie VanDeusen, another self-described friend of both the defendant and Swafford, testified that in mid-April 2001, within days of the murder and before the defendant was arrested, the defendant called VanDeusen and asked him if he wanted to "go do something." The defendant indicated to VanDeusen that the defendant had a car that would be good for a couple of days but then would probably be reported stolen.

As to the brutal nature of this crime, the State presented the testimony of police officers and a crime scene investigator who authenticated crime scene photographs that depicted, in bloody detail, the savagery and wanton cruelty of the murder. The photographs show broken furniture and household goods, pools and splotches of blood found throughout the home where the murder took place, the victim's blood-splattered car, and the duct tape, bindings, and electrical cords that were used to restrain the victim before, and possibly while, he bled to death. The jury also heard testimony from pathologist Dr. Dolph Haege regarding the amount of force necessary to break a knife blade off in the victim's back so deeply that the broken pieces were not visible from outside the body but were visible only by X rays, testimony that bore witness to the ferocity of the attack. Dr. Haege also testified that the victim's throat was slit while the victim was still alive, and in all probability before the knife was broken in the victim's back, further evidence of the sheer depravity of the murder.

In sum, after a careful and thorough review of the proceedings as a whole, I simply do not believe that the defendant in this case has met his burden of proving that in the absence of his counsel's allegedly deficient performance there is a *reasonable probability* that the result of his trial would have been different, either in terms of his guilt or in terms of the finding that his killing of Michael Keller was accompanied by brutal and heinous behavior indicative of wanton cruelty. Furthermore, because a second basis—the defendant's prior conviction for residential burglary—existed that would justify the defendant's extended-term sentence and because the record demonstrates that this second basis was indeed considered by the judge in doling out that sentence, I do not believe it matters for purposes of determining potential prejudice whether the jury would still have found that the murder had been accompanied by brutal and heinous behavior indicative of wanton cruelty. Accordingly, I continue to have confidence in the outcome of the defendant's trial and cannot conclude that a new trial is warranted under the circumstances of this case. Because my colleagues conclude otherwise, I respectfully dissent.